# ALBERTSON'S, INC. *v.* KIRKINGBURG

No. 98–591.   Argued April 28, 1999—Decided June 22, 1999

556

Souter, J., delivered the opinion for a unanimous Court with respect to Parts I and III, and the opinion of the Court with respect to Part II, in which Rehnquist, C. J., and O'Connor, Scalia, Kennedy, Thomas, and Ginsburg, JJ., joined. Thomas, J., filed a concurring opinion, *post*, p. 578.

*Corbett Gordon* argued the cause for petitioner. With her on the briefs were *Heidi Guettler* and *Kelliss Collins.*

*Scott N. Hunt* argued the cause for respondent. With him on the brief was *Richard C. Busse.*

*Edward C. DuMont* argued the cause for the United States et al. as *amici curiae* urging affirmance. On the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, James A. Feldman, Jessica Dunsay Silver, Timothy J. Moran, Philip B. Sklover, Lorraine C. Davis,* and *Robert J. Gregory.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Trucking Associations, Inc., et al. by *James D. Holzhauer, Timothy S. Bishop,* and *Robert Digges;* for the Equal Employment Advisory Council et al. by *Ann Elizabeth Reesman, Corrie L. Fischel, Stephen A. Bokat,* and *Robin S. Conrad;* and for the United Parcel Service of America, Inc.,

JUSTICE SOUTER delivered the opinion of the Court.*

The question posed is whether, under the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 327, as amended, 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. III), an employer who requires as a job qualification that an employee meet an otherwise applicable federal safety regulation must justify enforcing the regulation solely because its standard may be waived in an individual case. We answer no.

I

In August 1990, petitioner, Albertson's, Inc., a grocery-store chain with supermarkets in several States, hired respondent, Hallie Kirkingburg, as a truckdriver based at its Portland, Oregon, warehouse. Kirkingburg had more than a decade's driving experience and performed well when petitioner's transportation manager took him on a road test.

Before starting work, Kirkingburg was examined to see if he met federal vision standards for commercial truck-drivers. 143 F. 3d 1228, 1230–1231 (CA9 1998). For many decades the Department of Transportation and its predecessors have been responsible for devising these standards for individuals who drive commercial vehicles in interstate commerce.[1] Since 1971, the basic vision regulation has required corrected distant visual acuity of at least 20/40 in each eye

by *William J. Kilberg, Thomas G. Hungar, Pamela L. Hemminger,* and *Patricia S. Radez.*

Briefs of *amici curiae* urging affirmance were filed for Justice for All et al. by *Catherine A. Hanssens, Beatrice Dohrn, Bennett Klein,* and *Wendy Parmet;* for the National Employment Lawyers Association by *Gary Phelan, Paula A. Brantner,* and *Daniel S. Goldberg;* and for James Strickland, Sr., et al. by *Douglas L. Parker.*

*JUSTICE STEVENS and JUSTICE BREYER join Parts I and III of this opinion.

[1] See Motor Carrier Act, § 204(a), 49 Stat. 546; Department of Transportation Act, § 6(e)(6)(C), 80 Stat. 939–940; 49 CFR § 1.4(c)(9) (1968); Motor Carrier Safety Act of 1984, § 206, 98 Stat. 2835, as amended, 49 U. S. C. § 31136(a)(3); 49 CFR § 1.48(aa) (1998).

and distant binocular acuity of at least 20/40. See 35 Fed. Reg. 6458, 6463 (1970); 57 Fed. Reg. 6793, 6794 (1992); 49 CFR § 391.41(b)(10) (1998).[2]  Kirkingburg, however, suffers from amblyopia, an uncorrectable condition that leaves him with 20/200 vision in his left eye and monocular vision in effect.[3]  Despite Kirkingburg's weak left eye, the doctor erroneously certified that he met the DOT's basic vision standards, and Albertson's hired him.[4]

In December 1991, Kirkingburg injured himself on the job and took a leave of absence.  Before returning to work in November 1992, Kirkingburg went for a further physical as required by the company.  This time, the examining physician correctly assessed Kirkingburg's vision and explained that his eyesight did not meet the basic DOT standards. The physician, or his nurse, told Kirkingburg that in order to be legally qualified to drive, he would have to obtain a waiver of its basic vision standards from the DOT.  See 143

---

[2] Visual acuity has a number of components but most commonly refers to "the ability to determine the presence of or to distinguish between more than one identifying feature in a visible target."  G. von Noorden, Binocular Vision and Ocular Motility 114 (4th ed. 1990).  Herman Snellen was a Dutch ophthalmologist who, in 1862, devised the familiar letter chart still used to measure visual acuity.  The first figure in the Snellen score refers to distance between the viewer and the visual target, typically 20 feet.  The second corresponds to the distance at which a person with normal acuity could distinguish letters of the size that the viewer can distinguish at 20 feet.  See C. Snyder, Our Ophthalmic Heritage 97–99 (1967); D. Vaughan, T. Asburg, & P. Riordan-Eva, General Ophthalmology 30 (15th ed. 1999).

[3] "Amblyopia," derived from Greek roots meaning dull vision, is a general medical term for "poor vision caused by abnormal visual development secondary to abnormal visual stimulation."  K. Wright et al., Pediatric Ophthalmology and Strabismus 126 (1995); see id., at 126–131; see also Von Noorden, supra, at 208–245.

[4] Several months later, Kirkingburg's vision was recertified by a physician, again erroneously.  Both times Kirkingburg received certification although his vision as measured did not meet the DOT minimum requirement.  See 143 F. 3d 1228, 1230, and n. 2 (CA9 1998); App. 49–50, 297–298, 360–361.

F. 3d, at 1230; App. 284–285. The doctor was alluding to a scheme begun in July 1992 for giving DOT certification to applicants with deficient vision who had three years of recent experience driving a commercial vehicle without a license suspension or revocation, involvement in a reportable accident in which the applicant was cited for a moving violation, conviction for certain driving-related offenses, citation for certain serious traffic violations, or more than two convictions for any other moving violations. A waiver applicant had to agree to have his vision checked annually for deterioration, and to report certain information about his driving experience to the Federal Highway Administration (FHWA or Administration), the agency within the DOT responsible for overseeing the motor carrier safety regulations. See 57 Fed. Reg. 31458, 31460–31461 (1992).[5] Kirkingburg applied for a waiver, but because he could not meet the basic DOT vision standard Albertson's fired him from his job as a truckdriver.[6] In early 1993, after he had left Albertson's, Kirkingburg received a DOT waiver, but Albertson's refused to rehire him. See 143 F. 3d, at 1231.

Kirkingburg sued Albertson's, claiming that firing him violated the ADA.[7] Albertson's moved for summary judgment

---

[5] In February 1992, the FHWA issued an advance notice of proposed rulemaking to review its vision standards. See 57 Fed. Reg. 6793. Shortly thereafter, the FHWA announced its intent to set up a waiver program and its preliminary acceptance of waiver applications. See id., at 10295. It modified the proposed conditions for the waivers and requested comments in June. See id., at 23370. After receiving and considering the comments, the Administration announced its final decision to grant waivers in July.

[6] Albertson's offered Kirkingburg at least one and possibly two alternative jobs. The first was as a "yard hostler," a truckdriver within the premises of petitioner's warehouse property, the second as a tire mechanic. The company apparently withdrew the first offer, though the parties dispute the exact sequence of events. Kirkingburg turned down the second because it paid much less than driving a truck. See App. 14–16, 41–42.

[7] The ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement,

solely on the ground that Kirkingburg was "not 'otherwise qualified' to perform the job of truck driver with or without reasonable accommodation." App. 39–40; see *id.*, at 119. The District Court granted the motion, ruling that Albertson's had reasonably concluded that Kirkingburg was not qualified without an accommodation because he could not, as admitted, meet the basic DOT vision standards. The court held that giving Kirkingburg time to get a DOT waiver was not a required reasonable accommodation because the waiver program was "a flawed experiment that has not altered the DOT vision requirements." *Id.*, at 120.

A divided panel of the Ninth Circuit reversed. In addition to pressing its claim that Kirkingburg was not otherwise qualified, Albertson's for the first time on appeal took the position that it was entitled to summary judgment because Kirkingburg did not have a disability within the meaning of the Act. See *id.*, at 182–185. The Court of Appeals considered but rejected the new argument, concluding that because Kirkingburg had presented "uncontroverted evidence" that his vision was effectively monocular, he had demonstrated that "the *manner* in which he sees differs significantly from the *manner* in which most people see." 143 F. 3d, at 1232. That difference in manner, the court held, was sufficient to establish disability. *Ibid.*

The Court of Appeals then addressed the ground upon which the District Court had granted summary judgment, acknowledging that Albertson's consistently required its truckdrivers to meet the DOT's basic vision standards and that Kirkingburg had not met them (and indeed could not). The court recognized that the ADA allowed Albertson's to establish a reasonable job-related vision standard as a prerequisite for hiring and that Albertson's could rely on Government regulations as a basis for setting its standard. The court held, however, that Albertson's could not use compli-

---

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U. S. C. § 12112(a).

ance with a Government regulation as the justification for its vision requirement because the waiver program, which Albertson's disregarded, was "a lawful and legitimate part of the DOT regulatory scheme." *Id.*, at 1236. The Court of Appeals conceded that Albertson's was free to set a vision standard different from that mandated by the DOT, but held that under the ADA, Albertson's would have to justify its independent standard as necessary to prevent "'a direct threat to the health or safety of other individuals in the workplace.'" *Ibid.* (quoting 42 U. S. C. § 12113(b)). Although the court suggested that Albertson's might be able to make such a showing on remand, 143 F. 3d, at 1236, it ultimately took the position that the company could not, interpreting petitioner's rejection of DOT waivers as flying in the face of the judgment about safety already embodied in the DOT's decision to grant them, *id.*, at 1237.

Judge Rymer dissented. She contended that Albertson's had properly relied on the basic DOT vision standards in refusing to accept waivers because, when Albertson's fired Kirkingburg, the waiver program did not rest upon "a rule or a regulation with the force of law," but was merely a way of gathering data to use in deciding whether to refashion the still-applicable vision standards. *Id.*, at 1239.

## II

Though we need not speak to the issue whether Kirkingburg was an individual with a disability in order to resolve this case, that issue falls within the first question on which we granted certiorari,[8] 525 U. S. 1064 (1999), and we think it worthwhile to address it briefly in order to correct three missteps the Ninth Circuit made in its discussion of the matter. Under the ADA:

[8] "Whether a monocular individual is 'disabled' per se, under the Americans with Disabilities Act." Pet. for Cert. i (citation omitted).

"The term 'disability' means, with respect to an individual—

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

"(B) a record of such an impairment; or

"(C) being regarded as having such an impairment." 42 U. S. C. § 12102(2).

We are concerned only with the first definition.[9] There is no dispute either that Kirkingburg's amblyopia is a physical impairment within the meaning of the Act, see 29 CFR § 1630.2(h)(1) (1998) (defining "physical impairment" as "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: . . . special sense organs"), or that seeing is one of his major life activities, see § 1630.2(i) (giving seeing as an example of a major life activity).[10] The question is whether his monocular vision alone "substantially limits" Kirkingburg's seeing.

In giving its affirmative answer, the Ninth Circuit relied on a regulation issued by the Equal Employment Opportunity Commission (EEOC), defining "substantially limits" as "[s]ignificantly restrict[s] as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the gen-

---

[9] The Ninth Circuit also discussed whether Kirkingburg was disabled under the third, "regarded as," definition of "disability." See 143 F. 3d, at 1233. Albertson's did not challenge that aspect of the Court of Appeals's decision in its petition for certiorari, and we therefore do not address it. See this Court's Rule 14.1(a); see also, e. g., Yee v. Escondido, 503 U. S. 519, 535 (1992).

[10] As the parties have not questioned the regulations and interpretive guidance promulgated by the EEOC relating to the ADA's definitional section, 42 U. S. C. § 12102, for the purposes of this case, we assume, without deciding, that such regulations are valid, and we have no occasion to decide what level of deference, if any, they are due, see Sutton v. United Airlines, Inc., ante, at 479–480.

eral population can perform that same major life activity."
§ 1630.2(j)(ii). The Ninth Circuit concluded that "the manner in which [Kirkingburg] sees differs significantly from the
manner in which most people see" because, "[t]o put it in its
simplest terms [he] sees using only one eye; most people see
using two." 143 F. 3d, at 1232. The Ninth Circuit majority
also relied on a recent Eighth Circuit decision, whose holding
it characterized in similar terms: "It was enough to warrant
a finding of disability . . . that the plaintiff could see out of
only one eye: the *manner* in which he performed the major
life activity of seeing was different." *Ibid.* (characterizing
*Doane* v. *Omaha*, 115 F. 3d 624, 627–628 (1997)).[11]

But in several respects the Ninth Circuit was too quick
to find a disability. First, although the EEOC definition

---

[11] Before the Ninth Circuit, Albertson's presented the issue of Kirkingburg's failure to meet the Act's definition of disability as an alternative
ground for affirmance, *i. e.*, for a grant of summary judgment in the company's favor. It thus contended that Kirkingburg had "failed to produce any material issue of fact" that he was disabled. App. 182. Parts
of the Ninth Circuit's discussion suggest that it was merely denying the
company's request for summary judgment, leaving the issue open for factual development and resolution on remand. See, *e. g.*, 143 F. 3d, at 1232
("Albertson's first contends that Kirkingburg failed to raise a genuine issue
of fact regarding whether he is disabled"); *ibid.* ("Kirkingburg has presented uncontroverted evidence showing that . . . [his] inability to see out
of one eye affects his peripheral vision and his depth perception"); *ibid.*
("if the facts are as Kirkingburg alleges"). Moreover the Government
(and at times even Albertson's, see Pet. for Cert. 15) understands the
Ninth Circuit to have been simply explaining why the company was not
entitled to summary judgment on this score. See Brief for United States
et al. as *Amici Curiae* 11, and n. 5 ("The Ninth Circuit therefore correctly
declined to grant summary judgment to petitioner on the ground that
monocular vision is not a disability"). Even if that is an accurate reading,
the statements the Ninth Circuit made setting out the standards governing the finding of disability would have largely dictated the outcome.
Whether one views the Ninth Circuit's opinion as merely denying summary judgment for the company or as tantamount to a grant of summary
judgment for Kirkingburg, our rejection of the sweeping character of the
Court of Appeals's pronouncements remains the same.

of "substantially limits" cited by the Ninth Circuit requires a "significant restrict[ion]" in an individual's manner of performing a major life activity, the court appeared willing to settle for a mere difference. By transforming "significant restriction" into "difference," the court undercut the fundamental statutory requirement that only impairments causing "substantial limitat[ions]" in individuals' ability to perform major life activities constitute disabilities. While the Act "addresses substantial limitations on major life activities, not utter inabilities," *Bragdon* v. *Abbott,* 524 U. S. 624, 641 (1998), it concerns itself only with limitations that are in fact substantial.

Second, the Ninth Circuit appeared to suggest that in gauging whether a monocular individual has a disability a court need not take account of the individual's ability to compensate for the impairment. The court acknowledged that Kirkingburg's "brain has developed subconscious mechanisms for coping with [his] visual impairment and thus his body compensates for his disability." 143 F. 3d, at 1232. But in treating monocularity as itself sufficient to establish disability and in embracing *Doane,* the Ninth Circuit apparently adopted the view that whether "the individual had learned to compensate for the disability by making subconscious adjustments to the *manner* in which he sensed depth and perceived peripheral objects," 143 F. 3d, at 1232, was irrelevant to the determination of disability. See, *e. g., Sutton* v. *United Air Lines, Inc.,* 130 F. 3d 893, 901, n. 7 (CA10 1997) (characterizing *Doane* as standing for the proposition that mitigating measures should be disregarded in assessing disability); *EEOC* v. *Union Pacific R. Co.,* 6 F. Supp. 2d 1135, 1137 (Idaho 1998) (same). We have just held, however, in *Sutton* v. *United Airlines, Inc., ante,* at 482, that mitigating measures must be taken into account in judging whether an individual possesses a disability. We see no principled basis for distinguishing between measures undertaken with artificial aids, like medications and devices, and

measures undertaken, whether consciously or not, with the body's own systems.

Finally, and perhaps most significantly, the Court of Appeals did not pay much heed to the statutory obligation to determine the existence of disabilities on a case-by-case basis. The Act expresses that mandate clearly by defining "disability" "with respect to an individual," 42 U. S. C. § 12102(2), and in terms of the impact of an impairment on "such individual," § 12102(2)(A). See *Sutton, ante,* at 483; cf. 29 CFR pt. 1630, App. § 1630.2(j) (1998) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"); *ibid.* ("The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis"). While some impairments may invariably cause a substantial limitation of a major life activity, cf. *Bragdon, supra,* at 642 (declining to address whether HIV infection is a *per se* disability), we cannot say that monocularity does. That category, as we understand it, may embrace a group whose members vary by the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual abilities. These variables are not the stuff of a *per se* rule. While monocularity inevitably leads to some loss of horizontal field of vision and depth perception,[12] consequences the Ninth

---

[12] Individuals who can see out of only one eye are unable to perform stereopsis, the process of combining two retinal images into one through which two-eyed individuals gain much of their depth perception, particularly at short distances. At greater distances, stereopsis is relatively less important for depth perception. In their distance vision, monocular individuals are able to compensate for their lack of stereopsis to varying degrees by relying on monocular cues, such as motion parallax, linear perspective, overlay of contours, and distribution of highlights and shadows. See Von Noorden, *supra* n. 2, at 23–30; App. 300–302.

Circuit mentioned, see 143 F. 3d, at 1232, the court did not identify the degree of loss suffered by Kirkingburg, nor are we aware of any evidence in the record specifying the extent of his visual restrictions.

This is not to suggest that monocular individuals have an onerous burden in trying to show that they are disabled. On the contrary, our brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision "ordinarily" will meet the Act's definition of disability, Brief for United States et al. as *Amici Curiae* 11, and we suppose that defendant companies will often not contest the issue. We simply hold that the Act requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial.

### III

Petitioner's primary contention is that even if Kirkingburg was disabled, he was not a "qualified" individual with a disability, see 42 U. S. C. § 12112(a), because Albertson's merely insisted on the minimum level of visual acuity set forth in the DOT's Motor Carrier Safety Regulations, 49 CFR § 391.41(b)(10) (1998). If Albertson's was entitled to enforce that standard as defining an "essential job functio[n] of the employment position," see 42 U. S. C. § 12111(8), that is the end of the case, for Kirkingburg concededly could not satisfy it.[13]

---

[13] Kirkingburg asserts that in showing that Albertson's initially allowed him to drive with a DOT certification, despite the fact that he did not meet the DOT's minimum visual acuity requirement, he produced evidence from which a reasonable juror could find that he satisfied the legitimate prerequisites of the job. See Brief for Respondent 36, 37; see also *id.*, at 6. But petitioner's argument is a legal, not a factual, one. In any event, the ample evidence in the record on petitioner's policy of requiring adherence to minimum DOT vision standards for its truckdrivers, see, *e. g.,*

Under Title I of the ADA, employers may justify their use of "qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability," so long as such standards are "job-related and consistent with business necessity, and . . . performance cannot be accomplished by reasonable accommodation . . . ." § 12113(a). See also § 12112(b)(6) (defining discrimination to include "using qualification standards . . . that screen out or tend to screen out an individual with a disability . . . unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity").[14]

Kirkingburg and the Government argue that these provisions do not authorize an employer to follow even a facially applicable regulatory standard subject to waiver without making some enquiry beyond determining whether the applicant or employee meets that standard, yes or no. Before an employer may insist on compliance, they say, the employer must make a showing with reference to the particular job that the waivable regulatory standard is "job-related . . . and . . . consistent with business necessity," see § 12112(b)(6), and that after consideration of the capabilities of the individual a reasonable accommodation could not fairly resolve the competing interests when an applicant or employee cannot wholly satisfy an otherwise justifiable job qualification.

---

App. 53, 55–56, 333, would bar any inference that petitioner's failure to detect the discrepancy between the level of visual acuity Kirkingburg was determined to have had during his first two certifications and the DOT's minimum visual acuity requirement raised a genuine factual dispute on this issue.

[14] The EEOC's regulations implementing Title I define "[q]ualification standards" to mean "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 CFR § 1630.2(q) (1998).

The Government extends this argument by reference to a further section of the statute, which at first blush appears to be a permissive provision for the employer's and the public's benefit. An employer may impose as a qualification standard "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," § 12113(b), with "direct threat" being defined by the Act as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," § 12111(3); see also 29 CFR § 1630.2(r) (1998). The Government urges us to read subsections (a) and (b) together to mean that when an employer would impose any safety qualification standard, however specific, tending to screen out individuals with disabilities, the application of the requirement must satisfy the ADA's "direct threat" criterion, see Brief for United States et al. as *Amici Curiae* 22. That criterion ordinarily requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job," 29 CFR § 1630.2(r) (1998), "based on medical or other objective evidence," *Bragdon*, 524 U. S., at 649 (citing *School Bd. of Nassau Cty.* v. *Arline*, 480 U. S. 273, 288 (1987)); see 29 CFR § 1630.2(r) (1998) (assessment of direct threat "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence").[15]

---

[15] This appears to be the position taken by the EEOC in the Interpretive Guidance promulgated under its authority to issue regulations to carry out Title I of the ADA, 42 U. S. C. § 12116, see 29 CFR pt. 1630, App. §§ 1630.15(b) and (c) (1998) (requiring safety-related standards to be evaluated under the ADA's direct threat standard); see also App. § 1630.10 (noting that selection criteria that screen out individuals with disabilities, including "safety requirements, vision or hearing requirements," must be job-related, consistent with business necessity, and not amenable to reasonable accommodation); *EEOC* v. *Exxon Corp.*, 1 F. Supp. 2d 635, 645 (ND Tex. 1998) (adopting the EEOC's position that safety-related qualification standards must meet the ADA's direct-threat standard). Although it might be questioned whether the Government's interpretation, which

Albertson's answers essentially that even assuming the Government has proposed a sound reading of the statute for the general run of cases, this case is not in the general run. It is crucial to its position that Albertson's here was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable. The job qualification it was applying was the distant visual acuity standard of the Federal Motor Carrier Safety Regulations, 49 CFR § 391.41(b)(10) (1998), which is made binding on Albertson's by § 391.11: "[A] motor carrier shall not . . . permit a person to drive a commercial motor vehicle unless that person is qualified to drive," by, among other things, meeting the physical qualification standards set forth in § 391.41. The validity of these regulations is unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations.

If we looked no further, there would be no basis to question petitioner's unconditional obligation to follow the regulations and its consequent right to do so. This, indeed, was the understanding of Congress when it enacted the ADA, see *infra*, at 573–574.[16] But there is more: the waiver program.

The Court of Appeals majority concluded that the waiver program "precludes [employers] from declaring that persons determined by DOT to be capable of performing the job of commercial truck driver are incapable of performing that job by virtue of their disability," and that in the face of a waiver

---

might impose a higher burden on employers to justify safety-related qualification standards than other job requirements, is a sound one, we have no need to confront the validity of the reading in this case.

[16] The implementing regulations of Title I also recognize a defense to liability under the ADA that "a challenged action is required or necessitated by another Federal law or regulation," 29 CFR § 1630.15(e) (1998). As the parties do not invoke this specific regulation, we have no occasion to consider its effect.

an employer "will not be able to avoid the [ADA's] strictures by showing that its standards are necessary to prevent a direct safety threat," 143 F. 3d, at 1237.   The Court of Appeals thus assumed that the regulatory provisions for the waiver program had to be treated as being on par with the basic visual acuity regulation, as if the general rule had been modified by some different safety standard made applicable by grant of a waiver.   Cf. *Conroy* v. *Aniskoff,* 507 U. S. 511, 515 (1993) (noting the "'cardinal rule that a statute is to be read as a whole'" (quoting *King* v. *St. Vincent's Hospital,* 502 U. S. 215, 221 (1991))).   On this reading, an individualized determination under a different substantive safety rule was an element of the regulatory regime, which would easily fit with any requirement of 42 U. S. C. §§ 12113(a) and (b) to consider reasonable accommodation.   An employer resting solely on the federal standard for its visual acuity qualification would be required to accept a waiver once obtained, and probably to provide an applicant some opportunity to obtain a waiver whenever that was reasonably possible.   If this was sound analysis, the District Court's summary judgment for Albertson's was error.

But the reasoning underlying the Court of Appeals's decision was unsound, for we think it was error to read the regulations establishing the waiver program as modifying the content of the basic visual acuity standard in a way that disentitled an employer like Albertson's to insist on it.   To be sure, this is not immediately apparent.   If one starts with the statutory provisions authorizing regulations by the DOT as they stood at the time the DOT began the waiver program, one would reasonably presume that the general regulatory standard and the regulatory waiver standard ought to be accorded equal substantive significance, so that the content of any general regulation would as a matter of law be deemed modified by the terms of any waiver standard thus applied to it.   Compare 49 U. S. C. App. § 2505(a)(3) (1988 ed.) ("Such regulation shall . . . ensure that . . . the physical

condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely"),[17] with 49 U. S. C. App. § 2505(f) (1988 ed.) ("After notice and an opportunity for comment, the Secretary may waive, in whole or in part, application of any regulation issued under this section with respect to any person or class of persons if the Secretary determines that such waiver is not contrary to the public interest and is consistent with the safe operation of commercial motor vehicles").[18] Safe operation is supposed to be the touchstone of regulation in each instance.

As to the general visual acuity regulations in force under the former provision,[19] affirmative determinations that the selected standards were needed for safe operation were indeed the predicates of the DOT action. Starting in 1937, the federal agencies authorized to regulate commercial motor vehicle safety set increasingly rigorous visual acuity standards, culminating in the current one, which has remained unchanged since it became effective in 1971.[20] When

---

[17] This provision is currently codified at 49 U. S. C. § 31136(a)(3).

[18] Congress recently amended the waiver provision in the Transportation Equity Act for the 21st Century, Pub. L. 105–178, 112 Stat. 107. It now provides that the Secretary of Transportation may issue a 2-year renewable "exemption" if "such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." See § 4007, 112 Stat. 401, 49 U. S. C. § 31315(b) (1994 ed., Supp. IV).

[19] At the time the FHWA promulgated the current visual acuity standard, the agency was acting pursuant to § 204(a) of the Interstate Commerce Act, as amended by the Motor Carrier Act, 49 U. S. C. § 304(a) (1970 ed.), see n. 1, *supra*, which likewise required the agency to regulate to ensure "safety of operation."

[20] The Interstate Commerce Commission promulgated the first visual acuity regulations for interstate commercial drivers in 1937, requiring "[g]ood eyesight in both eyes (either with or without glasses, or by correction with glasses), including adequate perception of red and green colors." 2 Fed. Reg. 113120 (1937). In 1939, the vision standard was changed to require "visual acuity (either without glasses or by correction with glasses) of not less than 20/40 (Snellen) in one eye, and 20/100 (Snellen) in the other eye; form field of not less than 45 degrees in all meridians from the point of fixation; ability to distinguish red, green,

the FHWA proposed it, the agency found that "[a]ccident experience in recent years has demonstrated that reduction of the effects of organic and physical disorders, emotional impairments, and other limitations of the good health of drivers are increasingly important factors in accident prevention," 34 Fed. Reg. 9080, 9081 (1969) (Notice of Proposed Rule Making); the current standard was adopted to reflect the agency's conclusion that "drivers of modern, more complex vehicles" must be able to "withstand the increased physical and mental demands that their occupation now imposes." 35 Fed. Reg. 6458 (1970). Given these findings and "in the light of discussions with the Administration's medical advisers," *id.*, at 6459, the FHWA made a considered determination about the level of visual acuity needed for safe operation of commercial motor vehicles in interstate commerce, an "area [in which] the risks involved are so well known and so serious as to dictate the utmost caution." *Id.*, at 17419.

For several reasons, one would expect any regulation governing a waiver program to establish a comparable substantive standard (albeit for exceptional cases), grounded on known facts indicating at least that safe operation would not be jeopardized. First, of course, safe operation was the criterion of the statute authorizing an administrative waiver scheme, as noted already. Second, the impetus to develop a waiver program was a concern that the existing substantive standard might be more demanding than safety required. When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law. The Senate Labor and Human Resources Committee Report on the ADA stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability under title I of this legislation."

---

and yellow." 57 Fed. Reg. 6793–6794 (1992) (internal quotation marks omitted). In 1952, the visual acuity standard was strengthened to require at least 20/40 (Snellen) in each eye. *Id.*, at 6794.

S. Rep. No. 101–116, pp. 27–28 (1998). The two primary House Committees shared this understanding, see H. R. Rep. No. 101–485, pt. 2, p. 57 (1990) (House Education and Labor Committee Report); *id.*, pt. 3, at 34 (House Judiciary Committee Report). Accordingly, two of these Committees asked "the Secretary of Transportation [to] undertake a thorough review" of current knowledge about the capabilities of individuals with disabilities and available technological aids and devices, and make "any necessary changes" within two years of the enactment of the ADA. S. Rep. No. 101–116, at 27–28; see H. R. Rep. No. 101–485, pt. 2, at 57; see also *id.*, pt. 3, at 34 (expressing the expectation that the Secretary of Transportation would "review these requirements to determine whether they are valid under this Act"). Finally, when the FHWA instituted the waiver program it addressed the statutory mandate by stating in its notice of final disposition that the scheme would be "consistent with the safe operation of commercial motor vehicles," just as 49 U. S. C. App. § 2505(f) (1988 ed.) required, 57 Fed. Reg. 31460 (1992).

And yet, despite this background, the regulations establishing the waiver program did not modify the general visual acuity standards. It is not that the waiver regulations failed to do so in a merely formal sense, as by turning waiver decisions on driving records, not sight requirements. The FHWA in fact made it clear that it had no evidentiary basis for concluding that the pre-existing standards could be lowered consistently with public safety. When, in 1992, the FHWA published an "[a]dvance notice of proposed rulemaking" requesting comments "on the need, if any, to amend its driver qualification requirements relating to the vision standard," *id.*, at 6793, it candidly proposed its waiver scheme as simply a means of obtaining information bearing on the justifiability of revising the binding standards already in place, see *id.*, at 10295. The agency explained that the "object of the waiver program is to provide objective data

to be considered in relation to a rulemaking exploring the feasibility of relaxing the current absolute vision standards in 49 CFR part 391 in favor of a more individualized standard." *Ibid.* As proposed, therefore, there was not only no change in the unconditional acuity standards, but no indication even that the FHWA then had a basis in fact to believe anything more lenient would be consistent with public safety as a general matter. After a bumpy stretch of administrative procedure, see *Advocates for Highway and Auto Safety* v. *FHWA*, 28 F. 3d 1288, 1290 (CADC 1994), the FHWA's final disposition explained again that the waivers were proposed as a way to gather facts going to the wisdom of changing the existing law. The waiver program "will enable the FHWA to conduct a study comparing a group of experienced, visually deficient drivers with a control group of experienced drivers who meet the current Federal vision requirements. This study will provide the empirical data necessary to evaluate the relationships between specific visual deficiencies and the operation of [commercial motor vehicles]. The data will permit the FHWA to properly evaluate its current vision requirement in the context of actual driver performance, and, if necessary, establish a new vision requirement which is safe, fair, and rationally related to the latest medical knowledge and highway technology." 57 Fed. Reg. 31458 (1992). And if all this were not enough to show that the FHWA was planning to give waivers solely to collect information, it acknowledged that a study it had commissioned had done no more than "'illuminat[e] the lack of empirical data to establish a link between vision disorders and commercial motor vehicle safety,'" and "'failed to provide a sufficient foundation on which to propose a satisfactory vision standard for drivers of [commercial motor vehicles] in interstate commerce,'" *Advocates for Highway and Auto Safety, supra,* at 1293 (quoting 57 Fed. Reg. 31458 (1992)).

In sum, the regulatory record made it plain that the waiver regulation did not rest on any final, factual conclusion that the waiver scheme would be conducive to public safety in the manner of the general acuity standards and did not purport to modify the substantive content of the general acuity regulation in any way. The waiver program was simply an experiment with safety, however well intended, resting on a hypothesis whose confirmation or refutation in practice would provide a factual basis for reconsidering the existing standards.[21]

---

[21] Though irrelevant to the disposition of this case, it is hardly surprising that two years after the events here the waiver regulations were struck down for failure of the FHWA to support its formulaic finding of consistency with public safety. See *Advocates for Highway and Auto Safety* v. *FHWA*, 28 F. 3d 1288, 1289 (CADC 1994). On remand, the agency "revalidated" the waivers it had already issued, based in part on evidence relating to the safety of drivers in the program that had not been included in the record before the District of Columbia Circuit. See 59 Fed. Reg. 50887, 50889–50890 (1994); *id.*, at 59386, 59389. In the meantime the FHWA has apparently continued to want things both ways. It has said publicly, based on a review of the data it collected from the waiver program itself, that the drivers who obtained such waivers have performed better as a class than those who satisfied the regulation. See *id.*, at 50887, 50890. It has also recently noted that its medical panel has recommended "leaving the visual acuity standard unchanged," see 64 Fed. Reg. 16518 (1999) (citing F. Berson, M. Kuperwaser, L. Aiello, and J. Rosenberg, Visual Requirements and Commercial Drivers, Oct. 16, 1998), a recommendation which the FHWA has concluded supports its "view that the present standard is reasonable and necessary as a general standard to ensure highway safety." 64 Fed. Reg. 16518 (1999).

The waiver program in which Kirkingburg participated expired on March 31, 1996, at which point the FHWA allowed all still-active participants to continue to operate in interstate commerce, provided they continued to meet certain medical and other requirements. See 61 Fed. Reg. 13338, 13345 (1996); 49 CFR § 391.64 (1998). The FHWA justified this decision based on the safety record of participants in the original waiver program. See 61 Fed. Reg. 13338, 13345 (1996). In the wake of a 1996 decision from the United States Court of Appeals for the Eighth Circuit requiring the FHWA to justify the exclusion of further participants in the waiver program, see *Rauenhorst* v. *United States Dept. of Transporta-*

Nothing in the waiver regulation, of course, required an employer of commercial drivers to accept the hypothesis and participate in the Government's experiment. The only question, then, is whether the ADA should be read to require such an employer to defend a decision to decline the experiment. Is it reasonable, that is, to read the ADA as requiring an employer like Albertson's to shoulder the general statutory burden to justify a job qualification that would tend to exclude the disabled, whenever the employer chooses to abide by the otherwise clearly applicable, unamended substantive regulatory standard despite the Government's willingness to waive it experimentally and without any finding of its being inappropriate? If the answer were yes, an employer would in fact have an obligation of which we can think of no comparable example in our law. The employer would be required in effect to justify *de novo* an existing and otherwise applicable safety regulation issued by the Government itself. The employer would be required on a case-by-case basis to reinvent the Government's own wheel when the Government had merely begun an experiment to provide data to consider changing the underlying specifications. And what is even more, the employer would be required to do so when the Government had made an affirmative record indicating that contemporary empirical evidence was hard to come by. It is simply not credible that Congress enacted the ADA (before there was any waiver program) with the understanding that employers choosing to respect the Government's sole substantive visual acuity regulation in the

*tion, FHWA*, 95 F. 3d 715, 723 (1996), the agency began taking new applicants for waivers, see, *e. g.*, 63 Fed. Reg. 66226 (1998). The agency has now initiated a program under the authority granted in the Transportation Equity Act for the 21st Century, Pub. L. 105–178, 112 Stat. 107, to grant exemptions on a more regular basis, see 63 Fed. Reg. 67600 (1998) (interim final rule implementing the Transportation Equity Act for the 21st Century). The effect of the current exemption program has not been challenged in this case, and we have no occasion to consider it.

face of an experimental waiver might be burdened with an obligation to defend the regulation's application according to its own terms.

The judgment of the Ninth Circuit is accordingly reversed.

*It is so ordered.*

JUSTICE THOMAS, concurring.

As the Government reads the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 327, as amended, 42 U. S. C. § 12101 *et seq.* (1994 ed. and Supp. III), it requires that petitioner justify the Department of Transportation's (DOT) visual acuity standards as job related, consistent with business necessity, and required to prevent employees from imposing a direct threat to the health and safety of others in the workplace. The Court assumes, for purposes of this case, that the Government's reading is, for the most part, correct. *Ante,* at 569, and n. 15. I agree with the Court's decision that, even when the case is analyzed through the Government's proposed lens, petitioner was entitled to summary judgment in this case. As the Court explains, *ante,* at 577 and this page, it would be unprecedented and nonsensical to interpret § 12113 to require petitioner to defend the application of the Government's regulation to respondent when petitioner has an unconditional obligation to enforce the federal law.

As the Court points out, though, *ante,* at 567, DOT's visual acuity standards might also be relevant to the question whether respondent was a "qualified individual with a disability" under 42 U. S. C. § 12112(a). That section provides that no covered entity "shall discriminate against a qualified individual with a disability because of the disability of such individual." Presumably, then, a plaintiff claiming a cause of action under the ADA bears the burden of proving, *inter alia,* that he is a qualified individual. The phrase "qualified individual with a disability" is defined to mean:

"an individual with a disability who, *with or without reasonable accommodation,* can perform the *essential functions* of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job this description shall be considered evidence of the essential functions of the job." § 12111(8) (emphasis added).

In this case, respondent sought a job driving trucks in interstate commerce. The quintessential function of that job, it seems to me, is to be able to drive a commercial truck in interstate commerce, and it was respondent's burden to prove that he could do so.

As the Court explains, *ante,* at 570, DOT's Motor Carrier Safety Regulations have the force of law and bind petitioner—it may not, by law, "permit a person to drive a commercial motor vehicle unless that person is qualified to drive." 49 CFR § 391.11 (1999). But by the same token, DOT's regulations bind respondent, who "shall not drive a commercial motor vehicle unless he/she is qualified to drive a commercial motor vehicle." *Ibid.;* see also § 391.41 ("A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so"). Given that DOT's regulation equally binds petitioner and respondent, and that it is conceded in this case that respondent could not meet the federal requirements, respondent surely was not "qualified" to perform the essential functions of petitioner's truckdriver job without a reasonable accommodation. The waiver program might be thought of as a way to reasonably accommodate respondent, but for the fact, as the Court explains, *ante,* at 571–576, that the program did nothing to modify the regulation's unconditional requirements.

For that reason, requiring petitioner to make such an accommodation most certainly would have been *unreasonable*.

The result of this case is the same under either view of the statute. If forced to choose between these alternatives, however, I would prefer to hold that respondent, as a matter of law, was not qualified to perform the job he sought within the meaning of the ADA. I nevertheless join the Court's opinion. The Ninth Circuit below viewed respondent's ADA claim on the Government's terms and petitioner's argument here appears to be tailored around the Government's view. In these circumstances, I agree with the Court's approach. I join the Court's opinion, however, only on the understanding that it leaves open the argument that federal laws such as DOT's visual acuity standards might be critical in determining whether a plaintiff is a "qualified individual with a disability."