**A HELPING HAND, LLC**

v.

**BALTIMORE COUNTY, MARYLAND, et al.**

**No. CIV.A. CCB–02–2568.**

United States District Court, D. Maryland.

Dec. 17, 2003.

---

Emanuel M. Levin, Levin and Associates PA, Joel C. Richmond, Law Office of Joel C. Richmond, Baltimore, MD, for Plaintiff.

John Edward Beverungen, Baltimore County Law Department, Towson, MD, Edward J. Gilliss, Jeffrey Grant Cook, Baltimore County Office of Law, Towson, MD, for Defendants.

## MEMORANDUM

BLAKE, District Judge.

Three motions are pending in this lawsuit alleging violations of the Americans with Disabilities Act ("ADA") and the Due Process Clause of the Fourteenth Amendment. First, the defendants, namely, Baltimore County, Maryland, the Baltimore County Department of Permits and Development Management ("Permits Department"), the Office of the Zoning Commissioner of Baltimore County ("OZC"), and the County Council of Baltimore County ("County Council" or "Council"), have moved the court to grant an untimely jury demand under Rule 39(b) of the Federal Rules of Civil Procedure. (Docket No. 10.) Second, the County Council, one of the defendants, has filed a motion for a protective order to preclude depositions of members of the Baltimore County Council, arguing that legislative immunity bars this discovery. (Docket No. 12.) Finally, the plaintiff, A Helping Hand, LLC ("Helping Hand"), which operates a drug and alcohol treatment program in Baltimore County, has filed a motion for a protective order to prevent discovery of medical information pertaining to its patients.[1] (Docket No. 15.) The motions have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6. For the reasons that follow, the court will grant Helping Hand's motion and the defendants' jury request, but will deny the defendants' other motion.

## I.

Only a brief summary of the facts is required to address the issues in these motions. According to Helping Hand's complaint, this litigation arose from efforts by the defendants to prevent Helping Hand from locating a methadone treatment clinic in Baltimore County. Methadone maintenance therapy is a proven method of treating heroin dependence; for some addicts, it is the only effective treatment. (Compl. ¶ 21.) Although Helping Hand alleges that Baltimore County faces a "significant heroin addiction and treatment problem," there are, at present, only one or two treatment programs in Baltimore County, and the Director of the Baltimore County Bureau of Substance Abuse has expressed opposition to the establishment of additional clinics. (*Id.* ¶¶ 20, 22, 23.) Other methadone programs seeking to open in Baltimore County have experienced difficulties. In previous litigation, this court granted summary judgment in favor of a methadone clinic alleging violations of the ADA.[2] *See Smith Berch, Inc. v.*

---

1. In addition, the defendants have filed a motion to strike the plaintiff's "supplemental response" regarding the County Council's motion (docket no. 21) and a motion for leave to file a surreply regarding the plaintiff's motion (docket no. 23). These motions will be dealt with in the order accompanying this memorandum.

2. In the *Smith–Berch* litigation, this court held that the very ordinance at issue in this

case, Bill No. 39–02, violated an injunction imposed in the previous judgment. *See Smith–Berch, Inc. v. Baltimore County*, 216 F.Supp.2d 537 (D.Md.2002), *rev'd*, No. 02–2074, 64 Fed.Appx. 887, 2003 WL 2153346 (4th Cir. May 20, 2003) (unpublished disposition). The Fourth Circuit reversed that ruling on appeal on the grounds that the previous judgment had failed to specify that injunctive measures had been imposed.

*Baltimore County,* 115 F.Supp.2d 520 (D.Md.2000). A suit is now pending alleging violations against yet a third clinic. *See START, Inc. v. Baltimore County,* No. CCB–03–2051 (D. Md. filed July 15, 2003).

Operating a methadone clinic in Maryland requires approval by state and federal regulators, as well as compliance with local zoning laws. (*Id.* ¶¶ 24–27.) On February 1, 2002, following encouraging discussions with state officials, Helping Hand signed a three-year lease agreement for a site in Baltimore County that had previously served as a medical clinic. (*Id.* ¶¶ 33–35, 47.) Though Helping Hand alleges it was entitled to operate the clinic "as of right" under local zoning laws, Baltimore County officials required it to undergo a lengthy permitting process involving the submission of two successive site plans, the first of which was rejected. (*Id.* ¶¶ 41, 48–54.) A permit was finally issued at approximately 1:00 p.m. on April 15, 2002. (*Id.* ¶ 54.) Upon receiving the permit, Helping Hand immediately began contacting patients, scheduling appointments, and ordering methadone. (*Id.* ¶ 56.)

Barely six hours after the permit was approved, however, the County Council passed Bill No. 39–02, which subjected methadone clinics to zoning requirements that Helping Hand's new site did not satisfy. (*Id.* ¶¶ 56–57, Ex. A.) The bill became effective the following day when the County Executive signed it. (*Id.* ¶ 57.) Notwithstanding a six month exemption in the new law for entities that began operation before the bill took effect, Baltimore County officials have cited Helping Hand for violating the ordinance and fined it $200 per day, arguing that Helping Hand was not "operating" as of the law's effective date.[3] (*Id.* ¶¶ 5–6, 59.) Helping Hand alleges that the Council designed the bill to prevent its clinic from opening. (*Id.* ¶ 60.)

Helping Hand brought suit against the defendants on August 2, 2002. It alleges violations of Titles II and IV of the ADA, which prohibit, respectively, discrimination in the "services, programs, [and] activities" of a "public entity," 42 U.S.C. § 12132, and "interfere[nce] with" rights protected by the ADA, *id.* § 12203(b). Its theory is that its patients—"individuals with histories of alcohol and drug dependencies and individuals who are participating in or seeking methadone maintenance treatment"—are disabled under the ADA, and that Baltimore County has administered its zoning laws in a manner that discriminated against Helping Hand based on its association with these patients and penalized it for attempting to aid them in the enjoyment of their ADA rights. (*See id.* ¶¶ 81–89.) In addition, Helping Hand alleges that the defendants deprived it of property without due process by subjecting it to "an unnecessary and costly hearing process" regarding the $200 fines and by arbitrarily "disallowing its location from a previously approved site." (*Id.* ¶¶ 90–93.) Helping Hand is seeking declaratory, injunctive, and compensatory relief, as well as punitive damages and attorney's fees. (*Id.* at 22–23.)

## II.

The first motion under consideration is the defendants' jury demand. Because the defendants neither requested a jury in their Answer (docket no. 7) nor filed a demand within ten days of submitting that pleading, they no longer have an automatic right to jury trial. *See* Fed.R.Civ.P. 38(b). The defendants must instead petition the

---

**3.** The county officials apparently contend that Helping Hand would have been "operating" as of April 16, 2002 only if it had begun dispensing methadone. (*Id.* ¶ 6.) Helping Hand disputes this interpretation of the ordinance. (*Id.*)

court, as they have done, to grant a belated jury request under Rule 39(b).

"[T]he decision to grant jury trial pursuant to Rule 39(b) is committed to the discretion of the trial court." *Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, 940 (4th Cir.1980); *see also Martin v. Pepsi–Cola Bottling Co.*, 639 F.Supp. 931, 933 (D.Md.1986). The Fourth Circuit has identified several relevant considerations:

> (1) whether the issues are more appropriate for determination by a jury or a judge (i.e., factual versus legal, legal versus equitable, simple versus complex); (2) any prejudice that granting a jury trial would cause the opposing party; (3) the timing of the motion (early or late in the proceedings); (4) any effect a jury trial would have on the court's docket and the orderly administration of justice.

*Malbon*, 636 F.2d at 940 n. 11 (internal citations omitted). In addition, several courts, including the District of Maryland, have considered a fifth factor, "the reason for the failure to make a timely demand." *Wright Mfg., Inc. v. Great Dane Power Equip., Inc.*, 45 U.S.P.Q.2d 1543, 1543, 1998 WL 105470 (D.Md.1998); *see also, e.g., Farias v. Bexar County Bd. of Trustees Mental Health Retardation Servs.*, 925 F.2d 866, 873 (5th Cir.1991); *Vannoy v. Cooper*, 872 F.Supp. 1485, 1487 (E.D.Va. 1995).

■ The first three *Malbon* factors support the defendants' position. This case "does not present issues so complex as to make jury resolution difficult"; indeed, because the outcome may "turn on the credibility of the parties," a "resolution by a jury may be particularly appropriate." *Martin*, 639 F.Supp. at 933; *see also B. Braun Med. Inc. v. Abbott Labs.*, 892 F.Supp. 112, 114 (E.D.Pa.1995) (assigning equitable issues to the jury under Rule

39(b) based on the "predominantly factual nature of the dispute").[4] Moreover, considering that the request was made when discovery was just beginning, Helping Hand will have "ample time to prepare for a jury trial." *Martin*, 639 F.Supp. at 933; *see also Lawrence v. Hanson*, 197 F.Supp.2d 533, 537 (W.D.Va.2002) (upholding a magistrate judge's decision to grant jury trial under Rule 39(b) where the request was made "well before the trial date"). No significant prejudice has been shown. On the other hand, the fifth factor, the reason for the untimeliness, weighs against granting a jury trial. By the defendants' own admission (Def.'s Mot. at 1), their failure to make a timely demand was due to mere inadvertence—an excuse that courts have not received kindly. *See, e.g., Wright*, 45 U.S.P.Q.2d at 1543–44; *Farias*, 925 F.2d at 873. The fourth factor does not weigh greatly in favor of either side. A jury trial is not substantially more burdensome than a bench trial for the court and the parties, *see Lawrence*, 197 F.Supp.2d at 537, although in considering the impact on the court's calendar it is necessary to contemplate not only the effect of the delay in the particular case at hand, but also "the effect of routinely granting such motions on the overall effectiveness of the court's docketing system," *Gelardi v. Transamerica Occidental Life Ins. Co.*, 163 F.R.D. 495, 497 (E.D.Va.1995).

On balance, application of the five-factor test appears to favor granting the defendants' jury request; accordingly, the defendants' motion will be granted.

### III.

■ Next, the defendants seek a protective order to shield the individual members

---

**4.** To the extent there are issues of statutory interpretation or other complex legal questions, these will likely be decided by the court prior to trial or in the process of crafting jury instructions.

of the County Council from discovery. Helping Hand has indicated that it will seek depositions of the seven members of the Council; given that intentional discrimination violates the ADA, its goal is presumably to gather evidence about the councilors' intentions in passing Bill No. 39–02. While it appears that the councilors may decline to be deposed on grounds of legislative immunity, the County Council's motion must be denied because the Council may not assert the privilege on its members' behalf.

The Fourth Circuit has recognized an immunity that protects legislators from liability for legislative actions and spares them "from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves." *Schlitz v. Commonwealth of Virginia*, 854 F.2d 43, 46 (4th Cir.1988), *overruled on other grounds by Berkley v. Common Council of the City of Charleston*, 63 F.3d 295, 303 (4th Cir.1995) (en banc). This immunity extends to members of local legislative bodies. *See Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir.1996); *Bruce v. Riddle*, 631 F.2d 272, 279 (4th Cir.1980). The effect of the doctrine is to create "an evidentiary and testimonial privilege," *2BD Assocs. Ltd. P'ship v. County Comm'rs for Queen Anne's County*, 896 F.Supp. 528, 531 (D.Md.1995), that applies whenever the claims at issue "aris[e] out of [the legislators'] actions in a legislative capacity," *Roberson v. Mullins*, 29 F.3d 132, 134 (4th Cir.1994). *Cf. Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 298 (D.Md.1992) ("[A] state legislator acting within the sphere of legitimate legislative activity may not be a party to a civil suit concern-

ing those activities, nor may he be required to testify regarding those same actions.") (internal quotation marks omitted).

█ The privilege, however, is personal: it belongs to the individual members of a local legislature, not the municipality as a whole. *See Berkley v. Common Council of the City of Charleston*, 63 F.3d 295, 296 (4th Cir.1995) (en banc) (holding that a municipality is not immune from suit based on the actions of the local legislature); *Burtnick*, 76 F.3d at 613 (indicating that local legislators have a "testimonial privilege" but "[t]his privilege may be waived" by members of the local legislature). It follows, in this case, that it is not up to the Council to assert or waive the privilege; the councilors must do so for themselves. Indeed, even before the Fourth Circuit's en banc ruling in *Berkley*, the District of Maryland held that "[t]he privilege is a personal one and may be waived or asserted by each individual legislator." *Schaefer*, 144 F.R.D. at 298. Accordingly, Helping Hand, like previous litigants before this court, will be "free to notice for deposition individual ... legislators and to require each of those persons to assert the privilege on his own behalf."[5] *Id.* at 299 n. 16. The Council's motion will therefore be denied.

█ In the interest of providing guidance to the parties as they proceed with discovery, it bears mention that the councilors' claim of privilege, should they choose to assert it, would most likely be valid. Contrary to Helping Hand's claims, the passage of Bill No. 39–02 was a legislative action. The ordinance was not an executive or administrative measure; rather, it "involve[d] adopting prospective, leg-

---

**5.** While the court has no reason to doubt counsel's assertion that all seven council members have assented to the Council's motion, a ruling allowing the Council to assert the privilege on behalf of its members could

pose significant practical problems in a future case where, for example, some legislators are willing to waive the privilege but feel intimidated when voting on the matter in the company of their colleagues.

islative-type rules," *Alexander v. Holden,* 66 F.3d 62, 67 (4th Cir.1995), namely, the new zoning requirements imposed on "state-licensed medical clinics" (Bill No. 39–02, Compl. Ex. A). *See Alexander,* 66 F.3d at 66 ("[T]he action is legislative if the facts involve generalizations concerning a policy or state of affairs and the establishment of a general policy affecting the larger population.") (internal quotation marks omitted); *2BD Assocs.,* 896 F.Supp. at 532–34 (concluding that a municipal zoning ordinance was a legislative action because it announced a "proscriptive, legislative-type rule" and derived from a legislative process) (internal quotation marks omitted). Nor was the law a bill of attainder directed at only one party; rather, it affects all methadone clinics and drug and alcohol treatment centers.[6]

■ Helping Hand also argues that at least one council member has waived his immunity by speaking to the press about issues pertaining to Bill 39–02. While this councilor's statements may be evidence of the Council's intentions, *see, e.g., Pathways Psychosocial v. Town of Leonardtown,* 133 F.Supp.2d 772, 782 (D.Md. 2001) (indicating that "discriminatory animus" may have motivated a city council's action where one member of the council "successfully spearheaded an effort to build community opposition"); *cf. Tsombanidis v. City of West Haven,* 180 F.Supp.2d 262, 286 (D.Conn.2001) ("[G]overnmental actions taken in response to significant community bias may be tainted with discriminatory intent even where municipal employees and officials were not themselves biased."), they do not affect the councilors' immunity. "[A]ny waiver of the legislator's privilege 'can be found only after explicit and unequivocal renunciations of the protection.'" *2BD*

*Assocs.,* 896 F.Supp. at 535 (quoting *United States v. Helstoski,* 442 U.S. 477, 491, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979)). The court is aware of no authority to suggest that simply speaking to the press may constitute such a renunciation. To the contrary, the Fourth Circuit has indicated that meetings with constituents and interest groups are ordinary legislative business and fall within the scope of the immunity. *See Bruce,* 631 F.2d at 279–80. By the same token, public statements about legislative matters would appear to be an ordinary function of representative government and therefore a matter covered by legislators' testimonial privilege.

Thus, while I will remain open to considering specific areas of inquiry or forms of discovery that Helping Hand believes to be valid notwithstanding the councilors' privilege, it appears at present that the discovery Helping Hand is seeking is covered by legislative immunity, even though the Council may not assert that privilege on the legislators' behalf.

**IV.**

The third motion seeks a protective order to bar the defendants from obtaining medical information regarding Helping Hand's patients during discovery. Whether Helping Hand's patients are "individual[s] with a disability" under the ADA is a threshold issue in this litigation: if they are not, then Helping Hand will have no grounds to argue that the defendants' actions discriminated against the disabled or interfered with ADA rights. *See* 42 U.S.C. § 12132 (prohibiting discrimination by a public entity against a "qualified individual with a disability"); *id.* § 12203(b) (prohibiting interference with rights protected by the ADA). Because the Supreme Court

---

**6.** Indeed, another methadone clinic litigating before this court has protested with equal vehemence that it was targeted by the law.

*See START, Inc. v. Baltimore County,* No. CCB–03–2051 (D. Md. filed July 15, 2003).

has held that disability status ordinarily requires an "individualized assessment," *see Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198–99, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), the defendants argue they must have access to individualized information about Helping Hand's clientele. Helping Hand counters that exposing this information in discovery would raise substantial privacy concerns. It argues that the information may be covered both by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104–191, 110 Stat. 1936 (codified in scattered sections of 42 U.S.C.), and by Maryland's patient-psychotherapist privilege, Md.Code Ann., Cts. & Jud. Proc. §§ 9–109, 9–109.1, 9–121.

■ Neither of Helping Hand's privilege arguments is persuasive. Even assuming the patient data is covered by HIPAA, the HIPAA regulations permit discovery of protected health information so long as a court order or agreement of the parties prohibits disclosure of the information outside the litigation and requires the return of the information once the proceedings are concluded. *See* 45 C.F.R. § 164.512(e). While no such order or agreement is yet in effect, the parties presumably could obtain one. As for the cited Maryland provisions, the privileges they establish are not applicable here because this lawsuit is governed by federal, rather than state, law. *See* Fed.R.Evid. 501. The Supreme Court has recognized a privilege under federal law covering confidential communications between a patient and psychotherapist, *see Jaffee v. Redmond,* 518 U.S. 1, 9–10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), but Helping Hand has given no indication that it is entitled to claim that privilege, and "the party asserting a privilege bears the burden of establishing that privilege." *In re Grand Jury Proceedings, Thursday Special Grand Jury Term Sept., 1991,* 33 F.3d 342, 352 (4th Cir.1994).

■ Nevertheless, I am persuaded that there is good cause to limit discovery in this case, as I have discretion to do under Federal Rule of Civil Procedure 26(c)(4). The information the defendants seek is extremely sensitive. Recovering heroin addicts are likely to face difficult medical and personal issues, as well as a significant social stigma. They might be particularly uncomfortable having their files reviewed by these defendants, who have discriminated against them in the past. *See Smith Berch, Inc. v. Baltimore County,* 115 F.Supp.2d 520, 524 (D.Md.2000) (concluding that Baltimore County zoning policies illegally discriminated against drug-addicted individuals). Hence, discovery involving this information is almost certain to involve "annoyance, embarrassment, oppression, or undue burden or expense" on the part of the patients. Fed.R.Civ.P. 26(c).

Moreover, in contemplating a protective order under Rule 26(c), "the Court must weigh the need for the information versus the harm in producing it," *UAI Tech., Inc. v. Valutech, Inc.,* 122 F.R.D. 188, 191 (M.D.N.C.1988), and in this case it is not clear that the defendants will need individualized patient data to defend against the suit. Several courts have upheld ADA claims by entities like Helping Hand based on generalized information about typical patients and the criteria for receipt of the entity's services. *See Regional Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 47–48 (2d Cir. 2002) (concluding that residents of a halfway house for recovering alcoholics would have been disabled under the ADA based on the criteria for admission to the house); *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 338 (6th Cir.2002) (upholding the lower court's finding that clients of a me-

thadone clinic would have been disabled based on testimony that narcotics addiction "necessarily included impairments as to employability, parenting, and functioning in everyday life") (internal quotation marks and alterations omitted). Such evidence appears more relevant to Helping Hand's claims than the details of particular patient histories, given that Helping Hand is alleging discrimination based on its association with a population of disabled individuals, rather than discrimination against some individual in particular, as was the case in the Supreme Court decisions the defendants cite. *See Toyota Motor Mfg.*, 534 U.S. at 187, 122 S.Ct. 681 (claim by individual employee against employer); *Albertson's*, 527 U.S. at 558, 560–61, 119 S.Ct. 2162 (same); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 518, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (same); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475–76, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (claim by twin sisters against employer that rejected them); *Bragdon v. Abbott*, 524 U.S. 624, 628–29, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (claim by individual patient regarding dentist's treatment policy). Indeed, the evidence the defendants seek arguably would be relevant only if it showed that none of Helping Hand's patients were disabled, because association with even a single person meeting the statutory criteria may afford Helping Hand a claim. *Cf.* 42 U.S.C. § 12112(b)(4) (prohibiting employment discrimination based on "the known disability of an individual with whom the qualified individual [the employee or job applicant] is known to have a relationship or association"); *Barker v. Int'l Paper Co.*, 993 F.Supp. 10, 15–16 (D.Me.1998) (upholding a Title IV claim where an employee suffered retaliation after requesting an accommodation for his disabled wife). It appears sensible, therefore, to adopt the approach of the Second and Sixth Circuits and focus, at least initially, on the typical limitations of individuals who meet the criteria for treatment by Helping Hand.

For all these reasons, the court will limit discovery, for the time being, to (1) Helping Hand's general policies and practices in accepting patients, and (2) the typical characteristics of the patients Helping Hand serves or plans to serve. The defendants may depose Helping Hand's president, Joel Prell, or other officers of the company, but they may not inquire about the specific medical or personal circumstances of individual patients.

## V.

In sum, the court will grant the defendants' motion for a jury trial; deny the County Council's motion for a protective order to preclude depositions of members of the Baltimore County Council; and grant a protective order precluding disclosure of individualized patient information by Helping Hand.

A separate order follows.

## *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the defendants' Motion for Jury Trial (docket no. 10) will be **GRANTED;**

2. the defendant Baltimore County Council's Motion for Protective Order to Preclude Depositions of Members of the Baltimore County Council (docket no. 12) will be **DENIED;**

3. the plaintiff's Motion for Protective Order to Preclude Release of Privileged Communications (docket no. 15) will be **GRANTED;**

4. pursuant to Rule 26(c)(4) of the Federal Rules of Civil Procedure, the defendants will be barred from seeking to discover individualized medical and personal information about current and prospective clients of the plaintiff;

5. the defendants' Motion to Strike Plaintiff's Surreply Concerning Defendants' Motion for Protective Order (docket no. 21) will be **GRANTED**;

6. the defendants' Motion for Leave to File Surreply Regarding Plaintiff's Motion for Protective Order (docket no. 23) will be **DENIED**; and

7. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.