Lloyd ROWRY, Plaintiff,

v.

LITIGATION SOLUTIONS,
INC., Defendant.

No. 98 C 3833.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 8, 2000.

Jason R. Epstein, Chicago, IL, for plaintiff.

Christopher A. Kreid, Metge, Spitzer & Kreid, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

DENLOW, United States Magistrate Judge.

The Court conducted a two-day bench trial on January 25 and 26, 2000, to consider Plaintiff Lloyd Rowry's ("Rowry" or "Plaintiff") complaint that Defendant Litigation Solutions, Inc., ("LSI" or "Defendant") terminated his employment based on his race in violation of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981. Plaintiff also avers that Defendant refused to accommodate his disability and unlawfully terminated his employment in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). LSI responds that it terminated Rowry because of lack of performance on the job.

The Court has carefully considered the testimony of the eight witnesses who appeared at trial, the exhibits introduced into evidence, including the deposition of LSI's expert, the written submissions and the closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## I. FINDINGS OF FACT

### A. The Parties and Other Key LSI Employees

1. Rowry is an African–American male residing in Chicago, Illinois. He was employed at LSI as an account manager from September 11, 1996 to December 2, 1997, when he was terminated.

2. LSI was an Illinois corporation incorporated on May 11, 1996, and dissolved in May, 1998. LSI was engaged in the business of providing document-handling services, including copying and binding, and transactional support services to professional individuals and firms, including law firms and accounting firms, in the Chicago metropolitan area. LSI maintained its office at 231 South Jefferson, Chicago, Illinois.

3. Robert Dowling ("Dowling") was President, General Manager, and part-owner of LSI during Rowry's employment. Dowling hired Rowry. Dowling made the decision to terminate Rowry. Dowling testified at trial.

4. Carter Hill ("Hill") was hired as Sales Manager in January, 1997. Hill supervised Rowry and gave Dowling input on Rowry's performance. Hill did not testify.

5. Anastasia Lowery ("Lowery") was the Administrative Manager for LSI during Rowry's employment. She testified at trial. She did not provide input to Dowling which impacted Dowling's decision to terminate Rowry.

6. Mark Hoppe ("Hoppe") was the Office Manager for LSI during Rowry's employment. He testified at trial. He provided information to Dowling which Dowling relied upon in making the decision to terminate Rowry.

7. Tony Kosina ("Kosina"), a white male, was a founder and part owner of LSI. He was the Vice President for Operations from LSI's inception until November 15, 1996, when he was terminated. He sold his equity position in LSI in June, 1997. He testified at the trial. He was not at LSI when the decision to terminate Rowry was made.

8. Clayborn Walton, Jr. ("Walton") is an African–American male who was employed at LSI from the end of 1996 until early in 1998. He worked as an account manager, production supervisor and customer service representative. He described LSI as a friendly and open working environment. He testified at trial.

### B. Rowry's Employment at ScribTech

9. Before working for LSI, Rowry was employed with ScribTech Management Services, Inc. ("ScribTech") as a sales representative from May, 1995 through September 6, 1996. ScribTech was engaged in the business of commercial photocopying, primarily serving law firms in Chicago, Illinois.

10. Rowry's employment with ScribTech was terminated on or about September 6, 1996. In subsequent litigation, Rowry contended his discharge was due to

absence and illness; ScribTech contended Rowry was fired for poor performance.

## C. Rowry's Employment at LSI and ScribTech Lawsuit

11. LSI was formed in May, 1996. LSI began with three salespeople, Jerry Samson, Phil Hauff and Dowling. Salespeople were expected to do everything to service their customers, including picking up and delivering the work.

12. Samson introduced Rowry to Dowling after Rowry was terminated at Scrib-Tech. After learning that Rowry had been hired by LSI, ScribTech threatened and eventually instituted litigation in the Circuit Court of Cook County against Rowry to prevent Rowry from violating a covenant not to compete and from disclosing trade secrets.

13. LSI and Rowry cooperated in the defense of the lawsuit which resulted in a settlement agreement which prevented Rowry from soliciting business from fifty-nine law firms for a twelve-month period through September 6, 1997. In addition, LSI paid ScribTech $5,000 as part of the settlement. (Px V). In negotiating the list of names to which the restriction applied, Rowry was able to remove critical accounts which Rowry wanted to preserve. At no time did Rowry ever complain to Dowling that the Settlement Agreement was preventing him from being a successful account manager.

## D. Dowling's Management Style

14. Dowling began in the document handling business in 1994. He decided to form LSI in 1996 with Kosina and Walter Glass. Dowling was a no-nonsense boss who expected his employees to perform at a high level. He carefully monitored the sales performance of his account managers and the entire LSI operation. He made employment decisions based on employee performance. LSI grew dramatically under his leadership.

15. Tony Kosina was one of the founders of LSI and owned 18% of the stock at inception. He was the Vice–President of Operations. He was terminated on November 15, 1996 by Dowling because Dowling was not satisfied with Kosina's abilities to manage the production operation as LSI experienced substantial growth.

16. Dowling was the leading salesperson for the company. He expected account managers to be available to their customers at all times and to handle all phases of job pick up and delivery if necessary. He expected his account managers to be hands-on and to put full effort into promoting LSI.

## E. Rowry's Sales Experience at LSI

17. Rowry was paid a salary of $2,000 per month, plus 10% commissions on sales over $20,000. From September, 1996 until Hill's hiring in January, 1997, Rowry reported directly to Dowling. Thereafter, he was supervised by both Dowling and Hill.

18. Rowry's duties included calling on customers to solicit copying business, physically picking up the job from the customer, recording the job instructions, delivering the job to the LSI production department, entering the job into the billing system, reviewing and delivering the job to the customer, and following up on collections. These were the same duties expected of the other salespeople, except for Dowling. Because of the large volume of Dowling's business, he was assisted by a customer service representative who picked up and delivered jobs.

19. Account managers were evaluated, in part, on sales. Account managers were not required to strictly follow the rules which applied to those employed in production.

20. Rowry was one of two African–American account managers employed at LSI at the time in question. Walton was the second African–American account manager. While Rowry's duties were solely those of an account manager, Walton's duties included customer service and production management.

21. Rowry's co-workers included Jerry Sampson, Oscar Carreto, Gregory Mangum, Clayborn Walton, Shelly Daiker, Timothy Kigallen, John Halm, David Humphreys, and Mike Sullivan. At the time of hiring, Rowry came to LSI with the most sales experience in the document-handling field, based on his prior employment at ScribTech, as compared to other salespeople at LSI.

22. Rowry's sales from September, 1996 through October, 1997 ranged between $11,000 to $52,000 per month. There were no major problems noted in his performance or personal life until September, 1997.

## F. Rowry's Personal Problems and Counseling

23. In September of 1997, Rowry called his Sales Manager, Carter Hill, in the middle of the night distraught about breaking up with his girlfriend. Hill was sympathetic and told Rowry that since it was just his girlfriend, Rowry would get over breaking up with her. Thereafter, Rowry began losing weight and went to see a doctor. His physician referred him to Grace Gianforte ("Gianforte"), a licensed certified counselor and rehabilitation counselor.

24. In October, 1997, Rowry requested a six-month leave of absence to work out problems with his girlfriend. Rowry indicated his "head was not into work." In response to the request, Dowling offered to let Rowry have a six month leave without pay. Dowling advised Rowry that by taking time off from work Rowry risked losing his sales territory during his absence. Rowry refused the offer of a six month leave under these terms.

25. Rowry never saw a licensed psychiatrist, nor was he prescribed medicine to treat his condition. Beginning on October 28, 1997, Rowry met with Gianforte. She diagnosed him as suffering from depression, substance abuse and alcohol abuse and recommended that he receive treatment and counseling. Although she could not prescribe anti-depressants, she recommended that he be referred for anti-depressants, but this would require him to first stop drinking. She met with him again on October 28, November 5 and November 12.

26. Gianforte never spoke to Rowry's superiors at LSI concerning Rowry, nor did she observe Rowry to be substantially impaired in his ability to perform manual tasks, walk, see, hear, speak, breathe or learn.

27. In late November, Rowry again asked Hill to take time off in January. He requested to take vacation time and unused sick days. LSI did not permit employees to use unused sick days as vacation days. Hill advised Rowry that Dowling would likely not approve. Rowry made no further request for time off.

## G. Events Leading Up To Termination

28. Mark Hoppe was LSI's Office Manager and he shared a cubicle with Rowry during the last 6–8 months of Rowry's employment at LSI. Hoppe was able to overhear Rowry talk about the development of a Baby–Bib project, which Rowry was developing with a tailor friend, Maurice Hood ("Maurice"). Hoppe told Dowling that Rowry was spending a lot of time on the phone working on his Baby–Bib project. Rowry also advised Gianforte on November 5 that he was planning to assist Maurice on the distribution of the Baby–Bib product. In his visit with her on November 12, Rowry told Gianforte that he needed a job change and that he looked forward to working with Maurice.

29. In addition, Dowling had heard from Hill that Rowry had agreed to transfer some of his LSI accounts to John Halm in exchange for sales leads for the Baby–Bib project. This infuriated Dowling because Dowling was solely responsible for account assignments.

30. In November, 1997, Rowry's sales plummeted to $7,166.

31. Finally, on the day before Rowry was terminated, Dowling learned that

Rowry was at home and had put off picking up work on a day when LSI's production operation was slow and could use the work.

32. Dowling was unaware that Rowry was seeing a counselor.

33. Over the Thanksgiving Day weekend, Rowry traveled to Detroit to attempt to line up financing for his Baby–Bib project. Rowry was clearly capable of devoting his energies to a business venture and he was not suffering from any disability at the time of his discharge. Rowry was unhappy with his working situation at LSI. He felt unappreciated and underpaid. If he had been offered a higher commission rate, he would have been motivated. He perceived a great opportunity with the Baby–Bib project which captured his imagination, attention and energy. He voiced his excitement about the Baby–Bib project to Hoppe, including possible plans to market it to K–Mart. Hoppe communicated this to Dowling. Rowry checked himself out mentally at LSI and was looking for time off to see whether the Baby–Bib project could get off the ground before making a final decision to quit LSI. LSI made the decision for him.

34. On December 2, 1997, Rowry was advised by Hill and Dowling that his employment with LSI was terminated due to poor performance.

35. Dowling's decision to terminate Rowry was not based on his race or on his claimed depression, but was based on Dowling's determination that Rowry's performance was not adequate, that Rowry was improperly devoting time to the Baby–Bib project; that Rowry was improperly transferring accounts to other salespeople without his approval and was not performing up to the levels expected of a salesperson with Rowry's experience.

36. Dowling insisted on performance from his sales staff and executives. He terminated Kosina, a part-owner and Vice President for Operations for lack of performance. He terminated Camille Worthwein, a female salesperson, after several months in 1996 for lack of performance.

Rowry was also terminated for performance based reasons.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1. This Court has jurisdiction under Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e–5(f)(1) and (3); 42 U.S.C. § 1981, 28 U.S.C. §§ 1331, 1343.

### B. Burden of Proof for Employment Discrimination Based on Race or Disability

2. A plaintiff may prove a claim of discrimination by direct evidence or indirect evidence, through the use of the burden-shifting method established under *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish discrimination by this method the plaintiff must make a prima facie case by showing:

> he is a member of a protected class, that he was performing to the legitimate expectations of the defendant, that he suffered an adverse action, and that others not in the protected class were treated more favorably than him.

*Rothman v. Emory University,* 123 F.3d 446, 451 (7th Cir.1997) (*citing De Luca v. Winer Indus.,* 53 F.3d 793, 797 (7th Cir. 1995)).

3. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce some legitimate, nondiscriminatory reason for firing the plaintiff. *See id.* Once the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that the employer's stated reason is merely pretext for discriminatory action. *See id.*

4. To successfully challenge a defendant's reason for termination, the plaintiff must specifically rebut the legitimate reason for termination. *See Kariotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 677 (7th Cir.1997). The opportunity to rebut is not an invitation to critique the employer's evaluation process. *See id.* "Rather,

rebuttal must include facts tending to show that the employer's reasons for [terminating] the plaintiff are false, thereby implying (if not actually showing) that the real reason is illegal discrimination." *Id.* "The question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons are honest." *Id.* (*quoting Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992)).

5. Thus, the question before the trier of fact is whether the Plaintiff has proven by a preponderance of the credible evidence that but for the Plaintiff's race or disability, he would not have been terminated from his employment at LSI. *See Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir.1994).

## C. Race–Based Discrimination Claim

6. The Plaintiff has failed to prove by a preponderance of the credible evidence that his termination was the result of intentional discrimination based on his race.

7. It is undisputed that, until the corporation dissolved, LSI was an "employer" as defined in Section 701(b) of Title VII, 42 U.S.C. § 2000e(b). In addition, it is undisputed that LSI was engaged in an industry affecting commerce within the meaning of Sections 701(g) and (h) of Title VII, 42 U.S.C. § 2000e(g) and (h). It is further undisputed that Rowry is an African–American, and therefore a member of a protected class. However, this Court finds that the reasons given by Defendant for Rowry's termination were nondiscriminatory and non-pretextual.

8. Defendant explained that the reasons for Rowry's termination included his dismal sales performance in November of 1997, the use of his work time at LSI to make marketing calls for a Baby–Bib venture not related to his LSI employment, his attempt to trade LSI accounts with another account manager in return for contacts for his personal marketing venture, and putting off picking up work on a

day LSI's production department was slow and could use the work.

9. Plaintiff attempted to rebut these reasons by providing evidence that Walton also marketed products unrelated to his employment at LSI. However, it is clear from the testimony that this activity took place on Walton's free time and not during his work day. Plaintiff failed to rebut the evidence that he was fired due to his poor sales performance in November, particularly in light of the fact that a female account manager and male executive/part-owner were also fired for lack of performance and neither of these individuals were a racial minority. Finally, Plaintiff provided no rebuttal evidence to address the issues of trading accounts with another LSI account manager for his personal gain or putting off picking up work.

## D. ADA Disability–Based Discrimination Claim

10. The Plaintiff has failed to prove by a preponderance of the credible evidence that his termination was the result of intentional discrimination against his alleged disability. The Court finds that Plaintiff was not disabled within the meaning of the statute at the time of his termination and, even if he were disabled, Defendant has given reasons for Plaintiff's dismissal which are nondiscriminatory and non-pretextual.

11. The stated purpose of the ADA is to provide a "national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). This mandate reads, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of such employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

12. It is the plaintiff's burden to prove that he was a "qualified individual with a

disability" within the meaning of the statute at the time of the employment action. *See Corder v. Lucent Technologies, Inc.,* 162 F.3d 924, 928 (7th Cir.1998). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To meet this burden, the plaintiff must show that he was disabled at the time of the adverse action and could perform the essential functions of the job or that a reasonable accommodation would enable him to do so. *See Waggoner v. Olin Corp.,* 169 F.3d 481, 484 (7th Cir.1999).

13. A disability may be actual, historical, or perceived:

> Disability means, with respect to an individual—
>
> (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (2) A record of such an impairment; or
>
> (3) being regarded as having such an impairment.

29 C.F.R. § 1630.2(g). Plaintiff made no claim and there is no evidence offered to support a claim that LSI discriminated against him based on a history or perception that he was disabled. Therefore, the Court will consider only if Plaintiff was actually disabled within the meaning of the statute.

14. A disability can be based on a mental impairment, defined as "[a]ny mental or psychological disorder...." 29 C.F.R. § 1630.2(h)(2). The determination of whether an impairment rises to the level of a disability must be made on a case by case basis. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999); see also 29 C.F.R. pt. 1630 App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.")

It is the plaintiff's burden to prove that he was personally substantially limited in a major life activity. *See Albertsons, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999). In making its determination, the court may consider such factors as "[t]he nature and severity of the impairment ... [t]he duration or expected duration of the impairment ... and ... [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i), (ii) and (iii).

15. The major life activities identified by the Plaintiff as substantially limited by his depression include the ability to work, think, concentrate, or take care of himself. There is no evidence that the Plaintiff's depression substantially limited his general ability to work. During the month of November, 1997, Rowry continued to work at LSI while pursuing the Baby–Bib venture. In addition, following his termination from LSI, Plaintiff secured and worked at a subsequent marketing representative/director of marketing position.

16. Likewise, the evidence supporting Plaintiff's claim that he was unable to think, concentrate or take care of himself was insufficient. Plaintiff testified that he was unable to file his income taxes for the year of 1997, that he lost 41 pounds over the course of several months, that he suffered from bouts of insomnia, and currently has bags of mail that he did not open from this period. However, during this same time period Plaintiff prepared himself for work everyday, worked on a side marketing venture in addition to his full-time position at LSI, paid his bills and supported himself. This contradicts his assertion that he was substantially limited in these areas.

17. Assuming arguendo that Plaintiff was disabled at the time of his termination, he failed to show that his termination was based on intentional discrimination against that disability.

## E. Failure to Provide Reasonable Accommodation

18. The Court finds that Plaintiff was not disabled at the time of his termination from LSI within the meaning of the statute. However, even if the Court were to find that he was disabled, Plaintiff has failed to prove by a preponderance of the credible evidence that he requested and Defendant refused to make a reasonable accommodation for his disability as required under the ADA.

19. Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]...." 42 U.S.C. § 12112(b)(5)(A). The statute requires that the limitations of the employee be known to the employer. *See id.* Once the employer is made aware of the disability, the employee and employer must work together to determine a "reasonable accommodation." *See* 29 C.F.R. § 1630.2(*o*)(3) (stating "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual....")

20. An employer is not required to provide a disabled employee with the accommodation the employee requests or prefers, but merely with a reasonable accommodation. *See Gile v. United Airlines, Inc.,* 95 F.3d 492, 499 (7th Cir.1996). The ADA's definition of reasonable accommodation includes:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training material or policies, the provision of qualified readers or interpreters, and other similar accommodations....

42 U.S.C. § 12111(9)(B). An employer may be required to accommodate a reasonable request for medical leave. *See Waggoner,* 169 F.3d at 483. However, a leave of absence for an indefinite amount of time is not considered reasonable under the ADA. *See Corder,* 162 F.3d at 928. Finally, an accommodation is not reasonable if it imposes an undue hardship on the employer. "Undue hardship" is defined as "an action requiring significant difficulty or expense...." 42 U.S.C. § 12111(10).

21. Dowling was not aware that Rowry was suffering from any disabling condition. Rowry's requests for a leave of absence and indication that his "head was not into work" were not sufficient to serve as notice of a disability. Dowling was not aware that Rowry was seeking counseling for depression nor did Rowry's counselor notify LSI of her diagnosis of depression. Notwithstanding these facts, Dowling agreed to grant the requested leave but refused to guarantee that Rowry's sales territory would be intact when he returned. To require LSI to choose between not servicing those accounts for six months or burdening other account managers with the maintenance of the accounts without the incentive of future remuneration would be unreasonable. Rowry refused the offer for time off on the terms proposed.

22. Rowry's second request for time off involved combining vacation and unused sick days. This request was against LSI's policy which did not permit employees to use sick days as general vacation time. Throughout this period the Defendant showed a willingness to dialogue with the Plaintiff about his needs.

### III. CONCLUSION

Plaintiff has failed to prove that he was terminated because of his race or because of any disability. Rather, the record clearly established that Plaintiff was terminated because he was not meeting his employer's expectations as a salesman. **Accordingly, the Court directs that judgment be entered in favor of Defendant, Litigation Solutions, Inc., and against Plaintiff,**

Lloyd Rowry, on Plaintiff's complaint, plus costs of suit.

SO ORDERED THIS 8TH DAY OF FEBRUARY, 2000.