EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellee,

James Aikens; James Francis;
Chris Wilson; Shawn Hogya,
Intervenors–Appellees,

v.

UNITED PARCEL SERVICE, INC.,
Defendant–Appellant.

Equal Employment Opportunity
Commission, Plaintiff,

and

James Aikens; James Francis;
Chris Wilson; Shawn Hogya,
Intervenors–Appellants,

v.

United Parcel Service, Inc.,
Defendant–Appellee.

Equal Employment Opportunity
Commission, Plaintiff–
Appellant,

and

James Aikens, Intervenor,

v.

United Parcel Service, Inc.,
Defendant–Appellee.

Nos. 01–15410, 01–15976, 01–15977.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 2002.

Filed Sept. 20, 2002.

William J. Kilberg and Thomas G. Hungar, Gibson, Dunn & Crutcher, Washington, DC, for the defendant-appellant-cross-appellee.

Barbara L. Sloan, Equal Employment Opportunity Commission, Washington, DC, for the plaintiff-appellee-cross-appellant.

John J. Mavredakis, Santa Rosa, CA, for the intervenors-appellees-cross-appellants.

Laura M. Franze, Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, for the amicus curiae.

Before CANBY, RYMER, Circuit Judges, and BERTELSMAN, Senior District Judge.*

RYMER, Circuit Judge.

These consolidated appeals involve monocular employees of United Parcel Service, Inc. (UPS) who wanted to drive small trucks and vans but are not qualified to do so under a vision protocol that UPS developed when the Department of Transportation (DOT) removed vehicles weighing less than 10,001 pounds from its own vision safety standards. At least two of these employees filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), which issued a reasonable-cause determination. The EEOC then brought this action under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., alleging that UPS's vision protocol discriminates against disabled persons who are otherwise qualified to drive small trucks and vans. Several employees intervened (Shawn Hogya, James Francis, James Aikens and Chris Wilson), and brought separate claims under the California Fair Employment and Housing Act, Cal. Govt.Code § 12940 et seq. The case went to trial as to four pilot claimants, Francis, Hogya, Stephen Ligas, and Raymond Brown, to resolve their individual claims and certain common issues including validity of the vision protocol.

Following a bench trial, the district court found in a published opinion that Francis and Ligas were disabled but not otherwise qualified, and that Hogya was not disabled. *EEOC v. United Parcel Serv., Inc.*, 149 F.Supp.2d 1115 (N.D.Cal. 2000). However, it found that UPS regards all persons with monocular vision as having an impairment that substantially limited the major life activity of seeing. Having so held, the court found that the ability to drive safely is an essential job function but that the company's safety standard must be applied equally to monocular as well as binocular applicants; it also found that UPS's vision protocol is not job-related or consistent with business necessity because less discriminatory alternatives exist to job-qualify applicants. Accordingly, the court enjoined UPS from using its vision protocol unless modified to eliminate the requirement of central vision acuity in both eyes, and in all events unless those who fail to pass are provided an individualized opportunity to demonstrate that they are as qualified to drive safely as those whom UPS ordinarily hires. In addition, the court's order requires UPS to allow Hogya to advance to UPS's driver training and trial program. The court certified its judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure as to Francis, Ligas and Hogya, and as to issues relating to the UPS vision protocol and standards that it must apply to monocular applicants for driving positions.

UPS appeals the judgment rendered against it and the injunctive relief that was ordered;[1] the EEOC cross-appeals the dismissal of Ligas and Francis; and intervenor Francis cross-appeals from the ruling that he is not otherwise qualified.

As it happens, since the district court's decision the United States Supreme Court decided *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). While not controlling, *Toyota* sheds considerable light on what the Court believes a claimant must show in order to have a *substantially* limiting impairment of a major life activity, and in

---

* Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. The Washington Legal Foundation filed an amicus curiae brief in support of UPS's appeal.

turn, to be "regarded as" having such an impairment, for purposes of the ADA. In light of *Toyota, Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), and *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), we hold that for a monocular individual to show that his impairment is a substantial limitation on the major life activity of seeing, the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life. Applying this standard, we conclude that neither Ligas nor Francis was disabled, so we affirm the judgment as to them. However, we believe that the district court should determine in the first instance whether, under this standard, UPS perceived that the claimants were substantially limited in seeing. Therefore, we reverse and remand on this issue.

Because the existence of a "disability" is a gateway requirement for the ADA, we refrain from commenting on any other issues raised on the appeal or cross-appeals. However, this panel will retain jurisdiction should further proceedings be necessary as a result of the district court's decision on remand.

## I

The district court's findings of fact and conclusions of law are extensive, and we recite only the salient points.

UPS is the largest carrier of private packages in the world. It picks up packages at homes and businesses, transports the packages to distribution centers where they are sorted by destination, ships them to destination distribution centers where they are loaded on to delivery trucks that follow set routes, and then delivers the packages to homes and businesses. Routes are organized within districts for efficiency; the most desirable, from the drivers' standpoint, are the longer ones that cover the most miles with the smallest number of packages and stops. For these routes smaller trucks are generally used. Whatever the configuration, routes are designed to require 8.7 hours of work to complete.

UPS employs some 70,000 "package car" drivers who will have started at entry level, part-time positions sorting and loading packages, and will have eventually gained enough seniority to bid for a full-time package car driver position under collective bargaining agreements with the Teamsters United Parcel Service National Negotiating Committee and with local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Package car drivers are either "unassigned" (because they lack seniority for an assigned route), or have a regular, established route.[2]

For decades, DOT regulated all commercial vehicles regardless of weight. However, in July 1995 it amended the regulations so that vehicles weighing less than 10,001 pounds are no longer covered. Most UPS package cars are over 10,001 pounds, but UPS also operates a number of smaller trucks and vans that are not subject to DOT regulation.[3] Drivers of

---

**2.** UPS has five driver categories: Utility drivers substitute for full-time package car drivers when needed; air drivers make airport runs; package car drivers are full-time drivers who have a single, established route or are unassigned, depending on seniority; mechanics occasionally drive delivery trucks while making road calls or test drives; and feeder drivers drive large, multiple axle tractor trailer trucks. The trucks driven by feeder drivers are regulated by DOT and are not at issue in this case.

**3.** The P20 is a 200 cubic foot minivan weighing 5,300 pounds that is used for part-time air

regulated vehicles are subject to DOT's physical standards, including for vision. Since 1971, DOT regulations have required corrected distant visual acuity. of at least 20/40 in each eye, binocular acuity of at least 20/40, and peripheral vision of 70 degrees in each eye. _See_ 35 Fed. Reg. 6458, 6463 (Apr. 22, 1970); 57 Fed. Reg. 6793, 6794 (Feb. 28, 1992); 49 CFR § 391.41(b)(10) (2002). Visual acuity refers to "the ability to determine the presence of or to distinguish between more than one identifying feature in a visible target." _See Albertson's,_ 527 U.S. at 558–59, 559 n. 2, 119 S.Ct. 2162 (citation omitted). "20/40" comes from the familiar Snellen chart; the first figure refers to distance between the viewer and the chart (normally 20 feet), and the second, to the distance at which a person with normal acuity can distinguish letters of the size that the viewer can distinguish at 20 feet. _Id._ The DOT regulation precludes qualification of a monocular driver, generally defined as someone who is either completely without sight in one eye or has less than 20/200 acuity in the affected eye. When DOT amended its regulations in 1995 to delete vehicles under 10,001 pounds, UPS adopted its own vision protocol.

UPS's protocol, which was drafted by Dr. Ned Witkin, a professor of optometry at Emory University, calls for central vision acuity of 20/40 in the "better" eye and at least 20/200 in the "affected" eye, together with 20/200 peripheral visual acuity and a combined horizontal visual field of at least 140 degrees. Corrected vision of no more than 20/200 is considered legally blind; normal peripheral vision is 20/200, and normal field of vision is between 160 and 180 degrees. A person with monocular vision typically has a field of view between 140 and 150 degrees. The protocol provides that drivers with less than 100 seconds (a second is a small unit of arc) of depth perception should have additional side view mirrors, and also contains requirements for color vision that are not at issue in this case. Anyone with vision worse than 20/200 in one eye, or without any vision at all in one eye, cannot pass the UPS protocol.

An employee who wants to become a package car driver must bid for an open position or apply for it by a letter of intent. He or she must complete a written application, provide a motor-vehicle certification, answer a DOT safety questionnaire, and submit a Department of Motor Vehicles (DMV) printout. Employees whose records show too many citations are disqualified. For example, in Northern California, a driver applicant is disqualified if the DMV record shows traffic citations with a combined value of three "points," as assessed by the DMV, within the last three years. The applicant must then complete a road test, conducted on a ten-mile course on public streets, within an established error range. Next there is a physical examination that includes the DOT vision standard. UPS normally requires all applicants to pass the DOT vision test because its practice is to pool entry-level package car drivers so that they are available to drive different routes and heavy (DOT-regulated) as well as lighter (non-DOT) vehicles, but it substitutes its own protocol for the vision-impaired. Those who pass receive classroom training in UPS's safe driving methods, drive for a day with a supervisor, and have a 30–day

---

delivery work. P30s and P31s are large vans with 300 cubic feet, weighing 7,900 and 8,500 pounds respectively. They are also used for part-time air delivery. Package cars come in several sizes: the P32 has 320 cubic feet and weighs 8,600 pounds; the P40 has 400 cubic feet and weighs 8,000 pounds; and one model of P500 truck weighs 9300–9600 pounds. In total, about eight percent of the UPS fleet weighs less than 10,001 pounds.

qualification period during which they drive a training route under varying degrees of supervision. It is not unusual for unsafe applicants to be disqualified. Air drivers are given the same safety training.

Francis, Hogya and Ligas sought full-time positions as package car or air drivers. Both Francis and Ligas have no vision in their right eye, and both were excluded from full-time driving positions under the vision protocol. Francis can do a full range of activities without trouble, such as reading, climbing stairs, shaving, chopping wood, sawing, and playing baseball, football and basketball. He cooks and has no difficulty cutting food with a knife. Francis drives a cart for UPS, drives injured workers to the hospital when needed, and is a hazardous waste responder. Before working for UPS, he did assembly line work with machines and computer maintenance. Francis says that his vision does not keep him from doing anything in daily life. However, he has difficulty with near field tasks such as putting a screwdriver on the head of a screw, putting a pot completely on a stove burner, and hammering a nail; for these tasks he relies on the sense of touch. This is because he, like many people with monocular vision, lacks stereopsis, which is the process of combining two retinal images into one. Stereopsis is important to depth perception within a few feet, but less so for depth perception at a distance where monocular individuals typically compensate by relying on monocular cues such as motion parallax, linear perspective, overlay of contours, and light and shadows. *See Albertson's*, 527 U.S. at 566–67 n. 12, 119 S.Ct. 2162 (citing G. von Noorden, Binocular Vision and Ocular Motility at 23–30 (4th ed. 1990)). The district court found that Francis is disabled under the ADA because of his total and permanent blindness in one eye and his near-field impairment to which he has never fully adapted.

However, the court found that Francis was not otherwise qualified because the ability to drive a vehicle safely is an essential job function for a professional driver employed at UPS, and Francis had had two "avoidable" accidents on the right (or affected-eye) side.

Ligas also has problems judging depth within five feet but not at distances further than that. He is legally blind in one eye with 20/20 vision in the other eye, and he has some peripheral vision. He "focuses in" when aligning a toothpaste cap on the tube, tying shoe laces, climbing up and down stairs, and putting keys in locks. Otherwise, his impairment does not substantially affect his ability to see. He stopped wrestling for fear of injury to his good eye, but he plays racquetball and golf. He works with tools. He has a Class D Florida driver's license which allows him to drive vehicles up to 10,000 pounds, and he had driven a commercial van and flatbed truck for four years without incident. Ligas sorts, loads, tapes boxes, and drives "irregular" vehicles (carts) for UPS. The court found that Ligas is substantially limited in seeing, but not qualified for the essential job requirement of safe driving because he rear-ended another car on account of driving too close to it.

Hogya is legally blind in his left eye. He has central vision acuity of 20/200 or worse in this eye, however he has useful sight for detecting form in that eye at the periphery. He mountain-bikes, water-skis, golfs, races Indy-style go-carts, shaves, dries his hair, shoots rifles, snowboards, hikes, chops wood, and ties fishing flies. His day-to-day life is unaffected, although he thinks that he is slower at tasks within arm's length such as turning screws or hammering a nail than other people. The court found that Hogya is not disabled, as he has adapted almost completely to his

impairment and it barely interferes with his ability to see. Hogya has had two accidents, but they were not avoidable. Therefore, absent application of the protocol, the court held that he is qualified to proceed to UPS's advanced level of training and testing.

The court found that UPS regarded all claimants as having an impairment that substantially limited their seeing (and, thus, that each is disabled under the ADA) because UPS has "a corporate-wide, deeply entrenched conviction that drivers with only one good eye are unsafe at any speed in any UPS vehicle"; UPS failed to follow Dr. Witkin's 1991 advice that the company could prudently reduce the visual acuity requirement in the affected eye to 20/200, that individuals without stereopsis could operate commercial vehicles without danger, and that safe driving only requires a combined visual field of 140 degrees; UPS employees believe that even monocular drivers with safe driving records are dangerous and cannot be trained to see everything they need to see when they need to see it; and UPS labeled one monocular employee (Yvonne Harbison) as "disabled" during the accommodation process that enabled her to resume driving after losing an eye to cancer, asked Francis about his "disability," and refused to allow Brown to drive a vehicle because UPS didn't want to be liable in case of an accident.

The court found that clear central acuity in one eye and some peripheral vision in the other are important in driving UPS trucks and that a carefully tailored vision protocol could be drawn. However, UPS's vision protocol swept too broadly and was not significantly correlated with the ability to drive safely. The court also found that less discriminatory alternatives exist that would serve UPS's needs without diluting safety, including for UPS to consider whether the applicant has had the benefit of rehabilitative or specialized driver training to compensate for the impairment; whether the applicant has a sustained driving record without avoidable accidents; whether the applicant has previously successfully driven commercial delivery vehicles; and whether the applicant could pass a supplemental driving test specifically designed to simulate scenarios of particular concern, such as darting pedestrians or cyclists.

On other issues the court held that UPS would not be liable for damages prior to amendment of the DOT regulations in July 1995, and that the FEHA claims need not be addressed because claimants who satisfy the definition of disability under the ADA necessarily will meet FEHA's less restrictive definition.

Finally, the court entered injunctive relief with respect to all monocular applicants for any driver position, restraining UPS from using its vision protocol unless modified to provide that central vision acuity of 20/40 or better in one eye with some gross peripheral vision in the affected eye is a passing grade, and requiring it to allow those who fail the protocol, even as modified, an individualized opportunity to demonstrate that they are as qualified to drive safely as those whom UPS ordinarily hires. The court further ordered UPS to allow Hogya to advance to its training program, and thereafter to enter into an interactive process to find practical ways for him to work as a full-time driver of vehicles weighing less than 10,001 pounds.

## II

UPS argues that the evidence is insufficient as a matter of law to support the finding that it regarded Hogya as disabled. Hogya is the only pilot claimant whose experience is at issue on UPS's appeal, and the liability determination turns entirely on his case. However, in response to the

EEOC's cross-appeal, UPS also argues that the judgment as to Francis and Ligas, which was entered on the basis that they are not otherwise qualified, may be affirmed on the alternative ground that neither is actually disabled. The points are necessarily related, because a person cannot be *regarded* as disabled unless the deficiency that the person is regarded as having is a *disability.*

### A

" '[D]isability' means with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Thus, to be disabled for purposes of the ADA, a person must have an impairment, that impairment must limit a major life activity, and the limitation on the major life activity must be substantial. There is no question that monocular vision is an impairment, or that "seeing" is a major life activity. Both the HEW Rehabilitation Act regulations and the EEOC ADA regulations include "seeing" as a major life activity along with such other examples as walking, hearing, and performing manual tasks.[4] 45 CFR § 84.3(j)(2)(ii) (2002) (HEW Regulations); 29 CFR § 1630.2(i) (2002) (EEOC Regulations). Rather, the question here is whether the particular impairment that a particular claimant has substantially limits that individual's major life activity of seeing.

EEOC regulations define "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to the average person. 29 CFR § 1630.2(j)(1)(i)-(ii). Factors that should be considered include "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Id.* at § 1630.2(j)(2)(i)-(iii). However, the Supreme Court has channeled the inquiry when the claimed disability has to do with monocular vision, for it made clear in *Albertson's,* 527 U.S. at 565, 119 S.Ct. 2162, that a "mere difference" in the manner in which a monocular individual sees does not make the limitation substantial; how an individual has learned to compensate for the impairment, including "measures undertaken, whether consciously or not, with the body's own systems," must be taken into account; and monocularity does not invariably cause a substantial limitation of a major life activity because that depends on the extent of a particular individual's own visual restrictions. *Id.* at 564–567, 119 S.Ct. 2162. While "people with monocular vision 'ordinarily' will meet the Act's definition of disability," to prove a disability they must offer evidence "that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." *Id.* at 567, 119 S.Ct. 2162. *See also Sutton,* 527 U.S. at 488–89, 119 S.Ct. 2139(holding that claimants with 20/200 vision or worse in both eyes who failed to meet the airline's minimum vision requirement of uncorrected visual acuity of 20/100 were not disabled within the meaning of the ADA because their vision was 20/20 or better corrected).

---

**4.** The Supreme Court has not decided whether the EEOC regulations are reasonable or are entitled to deference, although in several cases it has assumed that they are. *See, e.g., Toyota,* 122 S.Ct. at 689–90, 122 S.Ct. 681.

Although both *Albertson's* and *Sutton* involve impairments in vision, neither involved claimants who asserted that they were, or were regarded as, substantially limited in the major life activity of *seeing*. Each involved the major life activity of *working*. The only Supreme Court opinion to discuss a major life activity other than working (which the Court has assumed, but has not yet decided, is a major life activity) is *Toyota*.

In *Toyota*, the Court had to decide whether a claimant's carpal tunnel syndrome substantially limited her in the major life activity of performing manual tasks. Its decision was guided "first and foremost" by what the words "substantially"—in "substantially limits"—and "major"—in "major life activities"—mean. Observing that dictionaries define "substantially" as "considerable" or "to a large degree," "being that specified to a large degree or in the main," "[r]elating to or proceeding from the essence of a thing; essential," 122 S.Ct. at 691(quoting Webster's Third New International Dictionary 2280 (1976) and 17 Oxford English Dictionary 66–67 (2d ed. 1989)), the Court concluded that "[t]he word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Id.* at 691(comparing *Albertson's* explanation that a "mere difference" does not satisfy the EEOC's interpretation of "substantially limits"). "Major" means "important." *Id.* " 'Major life activities' thus refers to those activities that are of central importance to daily life." *Id.* Accordingly, the Court held, for performing manual tasks to fit into this category along with basic abilities such as walking, seeing and hearing, the tasks must be central to daily life. This being so, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* The Court remanded with instructions that Williams's ability to do manual tasks of central importance to daily life, such as household chores, bathing and brushing her teeth, should be part of the assessment of whether she was disabled. *Id.* at 693–94.

UPS and the EEOC differ on *Toyota*'s import for this case. The EEOC argues that *Toyota*'s discussion about activities of central importance to daily life pertains only to the major life activity of performing manual tasks. This seems correct, as far as it goes. If so, then it does not follow that substantiality of a vision impairment must be assessed by how severely it restricts the individual from doing activities of central importance to daily life—as UPS would like us to read the opinion. At the same time, the Court emphasized that except for the major life activity of working, where a class-based analysis is applied, whether an impairment constitutes a disability is not to be answered "only by analyzing the effect of the impairment in the workplace." *Id.* at 693. Thus, what one has to do for a particular job at work is not necessarily an important part of most people's lives.

■ We believe a fair reading of Albertson's, Sutton and *Toyota* requires that for a monocular individual to show that his impairment is a disability, the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life. This comports with *Toyota*'s focus on the daily activities (apart from working) that an impairment affects, and with the direction from *Sutton* and *Albertson's* that courts make a case by case determination of whether a vision impairment, as corrected or compensated for, is

substantially limiting across a broader range of activities than the job at issue. Thus, *some* visual impairment does not necessarily mean that the individual is *substantially* limited in seeing overall; put differently, it does not follow that seeing as a whole is substantially limited just because the individual has a deficiency in some aspect of vision. The critical inquiry is whether seeing as a whole is substantially limited for purposes of daily living.

■ Applying this standard here leaves us convinced that neither Francis nor Ligas is disabled. Despite not having fully compensated for loss of near-field vision, that impairment does not keep either one of them from using his eyesight as most people do for daily life. Both drive (including for UPS, just not its package cars), read, use tools, and play sports. Accordingly, they do not have an impairment that substantially limits the major life activity of seeing.[5]

### B

■ The same standard will apply to whether an individual is "regarded as" having an impairment that substantially limits the major life activity of seeing. It offends the ADA as much for a person to be "regarded as" having a disability, as actually to have one. This is because people should not be rejected on account of myths or stereotypes. The Act itself does not give definition to the concept, but the Supreme Court has held that a person is "regarded as" disabled (at least for purposes of the major life activity of working) if the covered entity "mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); *see also Sutton*, 527 U.S. at 489, 119 S.Ct. 2139. As *Sutton* explains:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of ... individual ability." See 42 U.S.C. § 12101[(a)](7).

*Id.* at 489, 119 S.Ct. 2139. However, "[a]s with real impairments, ... a perceived impairment must be substantially limiting and significant." *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 541 (9th Cir.1997)

---

5. *See, e.g., Szmaj v. Am. Tel. & Tel. Co.*, 291 F.3d 955 (7th Cir.2002) (congenital nystagmus, which causes difficulty in focusing, is not a disability); *Foore v. City of Richmond*, 6 Fed.Appx. 148, 2001 WL 285131 (4th Cir.2001) (unpublished disposition following *Albertson's* and holding that police officer's visual impairment—20/400 vision in right eye with no depth perception—that he had overcome is not a disability); *Tone v. United States Postal Serv.*, 242 F.3d 368, 2000 WL 1836764 (2d Cir.2000) (unpublished disposition holding that employee who lost an eye and did not meet Postal Service regulations for driving vehicles over 10,000 pounds was not substantially limited in major life activity of working); *Shannon v. New York City Transit Auth.*, 189 F.Supp.2d 55 (S.D.N.Y.2002) (employer does not "regard" employee who can't distinguish colors as possessing substantially limiting impairment where in fact it is not so limiting).

(quoting *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir.1996)).

■ UPS contends that none of the bases upon which the district court relied in finding that it regarded monocular individuals as disabled suffices. In particular, UPS challenges the sufficiency of evidence that amounts only to the following: that its employees were regarded as being unqualified to drive for UPS; that some UPS employees used the word "disabled" to refer to certain claimants; that the vision protocol (relaxed from the DOT standard) was not implemented until DOT amended its regulations to remove vehicles weighing less than 10,001 pounds even though its regulation wasn't being enforced before that; and that the protocol itself, or its settlement with Harbison, were intended as accommodations.

The EEOC counters that the single most compelling piece of evidence supporting the district court's finding is the protocol, which screens out people with monocular vision solely because they are legally blind in one eye. In the EEOC's view, it was reasonable for the court to infer that UPS perceived everyone screened out by the protocol as having the same limitations and therefore substantially limited in seeing. This inference is buttressed, the EEOC maintains, by testimony of UPS managers who were convinced that no monocular drivers could ever see well enough to drive safely despite evidence that some monocular drivers (for example, Harbison and DOT waiver drivers) had in fact driven UPS vehicles safely. Further, the EEOC submits that UPS's position conflates coverage with the business necessity defense that protects job-related qualification standards which do not discriminate. In any event, taking all of the evidence as a whole, the EEOC contends that the findings were not clearly erroneous.

We agree with the EEOC that the vision protocol is the most compelling evidence of UPS's attitude toward monocular vision, but we disagree that it has substantial probative value on the issue of disability given what the Supreme Court has said in *Murphy* and *Sutton*. In *Sutton*, the Court made clear that, "[s]tanding alone, the allegation that [the employer] has a vision requirement in place does not establish a claim that [the employer] regards [the applicant] as substantially limited in the major life activity of working." *Sutton*, 527 U.S. at 490, 119 S.Ct. 2139. While *Sutton* had to do with the major life activity of working rather than seeing, the point is equally applicable to seeing. "[A]n employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job." *Id.* at 490–91, 119 S.Ct. 2139. Similarly in *Murphy*, the Court held that evidence that UPS fired a mechanic because it regarded his hypertension as preventing him from obtaining a DOT health certification does not show that it regarded the employee as substantially limited in a major life activity. *Murphy*, 527 U.S. at 523–24, 119 S.Ct. 2133. In other words, there is nothing improperly discriminatory about a protocol that qualifies individuals for safe driving of particular UPS vehicles on the basis of a condition that is perceived to be *limiting* to their ability to see, but not *substantially* limiting. This is true whether or not UPS is correct in its judgment about what it takes to drive its package cars safely; for, as the Third Circuit has explained, "[a]n employer who simply, and erroneously, believes that a person is incapable of performing a particular job will not be liable under the ADA. Liability

attaches only to a mistake that causes the employer to perceive the employee as disabled within the meaning of the ADA, i.e., a mistake that leads the employer to think that the employee is substantially limited in a major life activity." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3d Cir.1999). Therefore, no reasonable inference can be drawn from the existence of the protocol alone that UPS "regards" those employees whose vision is too limited to pass it as *substantially* limited in seeing overall.

The other grounds articulated by the district court for finding that UPS regarded all claimants as having an impairment that substantially limited their seeing are also problematic. Ignoring Dr. Witkin's advice that UPS could prudently have vision requirements different from DOT's is immaterial because UPS had the right to adhere to DOT regulations so long as they were the law. *Albertson's* makes this clear. Casual references to "disability" in response to a query from Francis ("Has anything changed about your disability?"), in asking for a risk assessment on Harbison "given the nature of her disability," and in Harbison's reasonable accommodation agreement do not support a finding that the company regarded Hogya, or all claimants, as disabled. *See Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir.1995) (such comments are not enough to show that company regards claimants as disabled under the ADA); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir.2001) (efforts to accommodate do not show that employee was "regarded as" disabled), *clarified in other respects*, 292 F.3d 1045 (9th Cir.2002). Likewise, telling Brown that management "was not going to have UPS liable in case" he was in an accident at most shows that UPS regarded him as posing a safety problem for which it did not wish to have responsibility. None of these remarks pertained to Hogya. Further, that UPS was not forthcoming in notifying personnel of the protocol once adopted arguably shows ambivalence about shifting its standard, albeit only slightly, from the DOT standard; no more than the protocol itself does this tend to prove that UPS regarded all claimants as substantially limited in seeing rather than as not seeing well enough in all respects to drive its package cars safely.

■ This having been said, we recognize that an employer's motivation is very much a factual issue. We would not lightly overturn the district court's assessment, particularly after a bench trial. However, two additional difficulties persuade us to return the matter for a further look.

First, what we have just discussed are the district court's *reasons* for its ultimate finding and conclusion that all claimants are disabled within the meaning of the ADA because UPS regarded them as having an impairment that substantially limited their seeing. The court made no *finding* about what UPS actually regarded as the restriction, real or unreal, in claimants' vision that substantially limits all of them in the major life activity of seeing. The court found that stereopsis is not a ground upon which UPS disqualifies drivers, so lack of stereopsis cannot be the perceived disability even if, in the experience of some individuals, it might be a substantial limitation on their ability to see in the near field. At oral argument, the EEOC suggested that UPS mistakenly thought that all monocular individuals lack any depth perception, but the district court made no such finding. This leaves the exclusionary standards in the protocol itself. For sure they prove that UPS only wanted to have its package cars driven by employees with central vision acuity of 20/40 in the "better" eye and 20/200 in the "affected" eye as

well as peripheral visual acuity of 20/200 with a field of at least 140 degrees. But we cannot say without further insight from the district court that these standards alone show that UPS regarded those who couldn't meet them as having an impairment that prevents or severely restricts use of their eyesight in daily life.

Second, the district court undertook its task without benefit of *Toyota* or our adaptation of it for the major life activity of seeing. Even if UPS believed that Francis, Ligas and Hogya could not safely drive its package trucks, it does not follow that it regarded them as disabled unless it regarded their vision impairment as substantially limiting their overall ability to see for daily living. *See Thompson,* 121 F.3d at 541 (as 25–pound weight restriction does not amount to a substantial limitation on the ability to lift, the fact that the hospital believed employee was incapable of lifting 25 pounds did mean that it regarded her as disabled).

Given the district court's familiarity with the evidence, and the possible need for additional input from the parties, it is in a far better position than we to make this determination. Accordingly, we remand for findings and conclusions as to whether UPS regarded Francis, Ligas or Hogya as having a limiting, but not *substantially* limiting, vision impairment on the one hand, or on the other hand, incorrectly regarded them as having an impairment that substantially and significantly limits their overall seeing for purposes of daily life.

If the court holds that no claimant was regarded as disabled under the ADA, it should consider liability under the FEHA. It had no call to do so originally, because a

defendant who is not entitled to judgment with respect to the ADA *a fortiori* will not be entitled to one under the FEHA. *See Cripe v. City of San Jose,* 261 F.3d 877, 895 (9th Cir.2001). However, if remand were to result in judgment for UPS under the ADA, then the FEHA issues will have to be reached.

This panel will retain jurisdiction over any future appeal involving disability issues.[6]

REMANDED.

---

**6.** Should a future appeal be taken, briefing submitted on other issues in the present appeal and cross-appeals will be deemed submitted in any such future appeal as well.

Supplemental briefing may be filed with respect to intervening developments or authority, if any, pursuant to further order of the court.